## In re GROCERS' BAKING CO.

(District Court, M. and N. D. Alabama. Sept. 9, 1920.)

No. 17327.

1. **Corporations ⬉415—Statute authorizing mortgages of personal property by directors does not forbid execution by managing officers.**

    Code Ala. 1907, § 3481, authorizing corporate directors to execute mortgages on personal property, is simply declaratory of the common law, and does not prohibit the execution of mortgages by officers to whom the management of the corporation's affairs have been intrusted.

2. **Corporations ⬉426(4)—Directors ratify mortgages by formal resolution or by retaining proceeds.**

    A mortgage executed by corporate officers was ratified by the directors, where they subsequently passed a formal resolution authorizing the execution of a subsequent mortgage to confirm the first and retained the proceeds of the first mortgage.

3. **Corporations ⬉426(10)—Acceptance of beneficial acts of agent found from slight acts.**

    Where the unauthorized acts of a corporate agent are for the benefit of the corporation, its acquiescence and acceptance of such acts will be found from slight acts on the part of the corporation, reasonably accounted for only on the supposition of acceptance.

4. **Corporations ⬉426(1)—Ratified mortgage as binding as one originally authorized, except as to intervening rights.**

    Except as to intervening rights of strangers, ratification by corporation of unauthorized mortgage by its officers relates back to the time of the execution, and is equivalent to original authority.

5. **Mortgages ⬉16—Security for future advances is valid.**

    A mortgage to secure future advances, though not so expressed on its face, is valid between the parties, and as against subsequent purchasers and incumbrancers, at least so far as to secure advances made before the equities of others attach, in the absence of fraud or bad faith.

6. **Mortgages ⬉258—Bona fide purchaser of negotiable paper entitled to security of mortgage against equities.**

    A bona fide purchaser of commercial paper secured by a mortgage is entitled to the benefit of the mortgage as against equities to the same extent as to the negotiable paper itself.

7. **Bankruptcy ⬉303(1)—Creditors must prove assignment practically exhausts assets, within statute making such for benefit of creditors.**

    A trustee in bankruptcy, claiming the benefit of Code Ala. 1907, § 4295, making a general assignment of substantially all of assignor's property an assignment for the benefit of creditors, has the burden of showing that the mortgage attacked embraced substantially all the estate of the bankrupt.

8. **Bankruptcy ⬉178(3)—State statute giving creditors benefit of assignment of assets not applicable.**

    Code Ala. 1907, § 4295, making a mortgage of substantially all the assets of a corporation a general assignment for the benefit of creditors, does not apply to a proceeding instituted by a trustee in bankruptcy.

⬉For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**9. Fraudulent conveyances ⊖⇒3—State statute held enactment of common-law rule.**

Code Ala. 1907, § 4293, making all instruments intended to defraud creditors void as to the creditors, simply enacts the well-settled common-law rule.

**10. Courts ⊖⇒372 (1)—State decisions not controlling on question of commercial law.**

Though decisions of state tribunals on questions of commercial jurisprudence are entitled to respect, they are not conclusive authority by which judgment of the federal courts is to be bound.

**11. Bills and notes ⊖⇒356—Bank discounting notes is bona fide purchaser, though deposit not exhausted.**

A bank, which discounts a note secured by mortgage and places the amount on deposit for its customer, is a bona fide purchaser of the note, if some of the deposit has been withdrawn before conflicting equities attach, though the deposit has not been entirely exhausted.

**12. Bankruptcy ⊖⇒303 (3)—Evidence held to show bank advanced money on mortgages, so as to be bona fide purchaser.**

On a claim by a bank against a trustee in bankruptcy for preference note and mortgage, evidence that, when the bank discounted the note secured by the mortgage, its customer was indebted to it in excess of the amount, and contemporaneously paid more than half the amount on account of the indebtedness then matured, and thereafter exhausted the whole amount of the proceeds prior to the adjudication in bankruptcy, *held* to show that the bank was a bona fide purchaser of the note and mortgage.

**13. Bankruptcy ⊖⇒178 (1)—Mortgage to secure supplies for continuing operations not "fraudulent conveyance."**

The giving by a corporation of a mortgage to secure payment of a note for supplies already furnished and those which were to be furnished for the purpose of enabling the corporation to continue its operations is not a fraudulent conveyance within Bankruptcy Act, § 67e (Comp. St. § 9651).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Fraudulent Conveyance.]

**14. Bankruptcy ⊖⇒165 (1)—Payments on running accounts, followed by new sales, not preferences.**

Payment by a bankrupt on a running account for supplies furnished, where new sales succeeded the payments and the net result was to increase the value of the estate, are not preferential transfers, under Bankruptcy Act, § 60a (Comp. St. § 9644).

**15. Bills and notes ⊖⇒497 (1)—Purchasers before maturity presumed to be bona fide.**

The holder of negotiable paper acquired for value before its maturity is presumed to be a bona fide holder, in the absence of proof to the contrary.

In Bankruptcy. Involuntary proceedings against the Grocers' Baking Company. From an order of the referee, sustaining the claim of the Birmingham Trust & Savings Company, the trustee in bankruptcy appeals and brings a petition to review the same. Order confirmed.

Wood & Pritchard, of Birmingham, Ala., for trustee.

Cabaniss & Cabaniss, of Birmingham, Ala., for Birmingham Trust & Savings Co.

CLAYTON, District Judge. The involuntary petition was filed January 8, 1920, against the Grocers' Baking Company, a corporation, and it was adjudicated a bankrupt on the 16th day of the same month.

The Birmingham Trust & Savings Company, a banking corporation, claimed a superior lien under a certain two mortgages hereinafter described. The trustee brings this petition for review of the order of the referee, sustaining the claim of the bank and directing that the trustee pay, out of the proceeds derived from the sale of the property of the bankrupt's estate, $7,500, with interest thereon from December 6, 1919, to the bank.

The bankrupt was engaged in the bakery business on a large scale. Its prior names had been Martin Bread Bakery and Magnolia Baking Company. Under the latter name it came under the control of the Alien Property Custodian in July, 1918. On the 8th day of that month such custodian sold its machinery and equipment to the Grocers' Baking Company, the bankrupt here, for $30,000. The purchase money was furnished by Geo. A. Shaw and the corporation issued to him stock for the same. Thereafter, until he was put in jail, about December 10, 1919, Shaw had the management and conduct of the business, and was all the while president of the corporation.

On September 11, 1919, the bankrupt owed Connell & Baldwin, dealers in flour, etc., $2,106.21. At this time they refused to extend further credit to the bankrupt unless secured by mortgage. On that day the bankrupt gave them an acceptance for $900, due November 10, 1919; an acceptance for $1,200, due December 10, 1919; a note for $5,400, payable one day after date; and a mortgage to secure the three papers, which mortgage was filed for public record the next day. These papers are Exhibits 1, 2, 3, and 7 CLMcC. The acceptances were given as substantially covering the existing account, and the $5,400 note for future advances in flour, etc., to be made by Connell & Baldwin. It was explained that the reason why the note was drawn as due one day after date was because the real time of payment would be fixed later by agreement. The mortgage did not cover all of the equipment, as it was intended. The directors did not, in the first instance, authorize the execution of the mortgage. Shaw, as president and manager of the bankrupt business, executed the mortgage in its name, in order to continue the operation of the bakery. Shortly after these papers were made, Connell & Baldwin submitted them to their attorneys, Cabaniss & Cabaniss, for advice on the question of safety in making additional advances.

Then an examination of the affairs of the bankrupt was made by J. H. Cabaniss, a member of that firm, a member of Connell & Baldwin, and a bookkeeper. The result of the examination showed that the machinery and equipment, carried on the books of the bankrupt at $45,219, were apparently worth $35,000 as a going concern. The books of the bankrupt had not been very well kept, but no evidence was found on this examination of any indebtedness exceeding $12,000 or $13,000, including that of Connell & Baldwin. The bankrupt explained that its trouble was temporary, and was caused in part by shortage of operating capital and by stealing on the part of its subordinate employés while baking and delivering bread, and that since the discovery of such stealing it had been stopped, and it was also made to appear that the business was then earning a fair profit. The attorney ex-

amined the county records, and found there no judgment or liens against the bankrupt, except conditional sale contracts recorded against automobiles used in the business and the mortgage of September 11 to Connell & Baldwin. This investigation led Attorney Cabaniss and a member of the firm of Connell & Baldwin to believe that the assets of the baking company, as a going concern, were fairly worth about three times its liabilities.

On November 8, 1919, under formal resolutions of the board of directors adopted November 4, 1919, the bankrupt executed to Connell & Baldwin the two notes, Exhibits 5 and 6 CL,McC, for $4,300 and $3,-200, respectively, due in 75 and 90 days, respectively, after date, and the mortgage securing their payment, a copy of which is Exhibit 4 CL,McC. The mortgage was filed for public record November 13, 1919. On November 8, 1919, the amount owing to Connell & Baldwin was $3,379.61. This second mortgage was given to extend the security over the entire machinery and equipment, as well as to ratify and confirm the action previously taken by Shaw, and was intended by the parties to cover the accrued indebtedness of $3,379.61 and future advances to a total of $7,500.

On November 13, 1919, the Birmingham Trust & Savings Company, in due course of its banking business, discounted or purchased the two last-named notes, deducting unearned interest, paying therefor $7,507.91, and still holds and owns them. At the time the notes were acquired by the bank, Connell & Baldwin explained to the bank that they were secured by a mortgage on the machinery and equipment of the Grocers' Baking Company, on file for record in the probate office of the county. The bank (claimant) knew nothing more of the transaction or of the affairs of the bankrupt. On November 13, 1919, when the papers were discounted with the bank, the bankrupt owed Connell & Baldwin $4,091.52, and on January 9, 1920, the bankrupt owed them $8,402.70. The ledger record of this account is Exhibit 8 CL,McC, but involved, in that there is record of other items entered on each side of the ledger according to the methods of bookkeeping, such as credit for checks given and debit when the checks were dishonored, and charges for checks for pay roll of the bankrupt advanced by Connell & Baldwin, and credit for repayment made in whole or in part. An analysis of the account shows that the additional advances in flour and other merchandise, made after November 13, 1919, to keep the bakery in operation, and excluding cash advance, amounted to $4,834.14, and that the aggregate payments thereon were $1,300.73.

On September 17, 1919, Connell-Baldwin Company was incorporated, and took over the assets and assumed the liabilities of Connell & Baldwin, the partnership. Subsequent to that time the transactions with the bank were continued in the name of Connell & Baldwin, but by and for the successor corporation. The bank account with the Birmingham Trust & Savings Company continued in the name of Connell & Baldwin until the middle of January, 1920, when the new name was given to the concern.

Directors of the bankrupt were called as witnesses by the trustee for the purpose of showing that the bankrupt, from May, 1919, was insolvent, and that Connell & Baldwin had notice of the same, or of sufficient facts to charge them with notice, and that the first mortgage was executed without authority of the bankrupt corporation. Their testimony and the other evidence tended to show that a partial audit made in 1919 disclosed little or no operating capital, embarrassment for lack of money to meet the weekly pay roll and other current expenses, and a loss in operating of about $4,000 per month—all of which the directors thought was caused by the stealing of subordinate employés and Shaw's lack of watchful care. The belief of the directors of the bankrupt's solvency and ability to continue business successfully was manifested by their individual advances in money and credit from time to time to carry it over what they considered only temporary trouble. The accommodations continued until and after the time Shaw was incarcerated, about the middle of December, 1919. If the bankrupt was insolvent during the period of time covered by the transactions involved, the directors testified that they did not know it, and did not believe it was insolvent.

The property covered by the mortgage was sold, free of liens, by the trustee, under regular order of the bankrupt court, and brought $10,250. The referee held, in effect, that inasmuch as the property sold in July, 1918, for about $30,000, and afterwards, under judicial sale in bankruptcy, for $10,250, it was reasonable to conclude that Connell & Baldwin were justified in their belief that the property, as that of a going concern, was worth the original price paid to the Alien Property Custodian, and that, with proper management, the business would be profitable and successful. The investigation made by Attorney Cabaniss, with competent assistants, indicated to a reasonable extent that, at the time of the execution of the papers now owned by the Birmingham Trust & Savings Company, the bankrupt owed not over $5,000 or $6,000 above what it owed Connell & Baldwin.

[1] The trustee invokes section 3481 of the Code of Alabama as against the validity of the mortgages. This statute, in so far as it provides that mortgages on personal property may be executed by the directors, is simply declaratory of the common law. The affairs of a corporation, as a general proposition, are under the management and control of its board of directors. At common law a mortgage on the property of a corporation may be valid under certain circumstances, although it may not have been expressly authorized by the directors; and there is no contrary inhibition in the Alabama statutes. It is a settled law that—

"If the stockholders and directors turn over the management of the business to one or more officers or persons, and virtually abandon their functions and duties as directors and stockholders, such person or persons have apparent power to do any act in the ordinary course of the business, including the giving of a mortgage, execution of notes," etc. Fletcher, Cyc. Corp. §§ 2097, 2098.

"If it was within the power of the corporation, as we hold it was, to create the debt through the agency of the managing officers vested with the ordinary functions of the board of directors, a mortgage of its property, executed in its behalf by such officers while exercising such authority, must be held valid also,

notwithstanding there was no authority from the board of directors; for it is an ordinary incident to the creation of a debt (Thomp. Corp. § 6133), and the power to give it came from the ultimate constituency." Cunningham v. German Ins. Bank, 101 Fed. 977, 41 C. C. A. 609.

[2] And the evidence in this case is convincing that the directors of the Grocers' Baking Company had committed the entire management and conduct of the affairs of the corporation to Shaw, and he had apparent authority to execute the first mortgage. However, if the mortgage was not authorized, it was subsequently ratified (1) by the formal resolutions adopted by the board of directors; (2) by the giving of the second mortgage, expressly approving the first; (3) by the acquiescence of the corporation in receiving and retaining the proceeds acquired under the first mortgage; and (4) by the failure to disaffirm and to return such proceeds. It was held in Taylor v. A. & M. Ass'n, 68 Ala. 229, that—

"A loan having been negotiated for a corporation, and to secure it a mortgage made, but defectively executed, on its property by an agent, an acceptance by the corporation of the benefits of the transaction, by receiving and appropriating to its own uses the money obtained on the loan constitutes a ratification of the agent's act; and, although resting in parol, the ratification, in equity, operates as an estoppel on the corporation from denying the authority of the agent, or the execution of the mortgage."

[3] Acquiescence may rest on the principle of ratification or upon the principle of estoppel. 4 Fletcher, Cyc. Corp. 2195; Pollitz v. Wabash R. Co., 207 N. Y. 113, 100 N. E. 721. And it was said in Bank of U. S. v. Dandridge, 25 U. S. (12 Wheat.) loc. cit. 70, 6 L. Ed. 552, that—

"Grants and proceedings, beneficial to the corporation, are presumed to be accepted, and slight acts on their part, which can be reasonably accounted for only upon the supposition of such acceptance, are admitted as presumptions of the fact."

[4] The principle is laid down in 4 Fletcher, Cyc. Corp. § 2207, and sustained by numerous authorities cited, that—

"Except as to intervening rights of strangers, ratification by a corporation of an unauthorized act or contract by its officers or others relates back to the time of the act or contract ratified, and is equivalent to original authority. The corporation and the other party to the transaction are in precisely the same position as if the act or contract had been authorized at the time." Fleckner v. U. S. Bank, 21 U. S. (8 Wheat.) 338, 5 L. Ed. 631.

It was held in Foerstner v. Citizens' Sav. & T. Co., 186 Fed. 1, 108 C. C. A. 267, that where a defectively executed mortgage under the local law amounts to no more than an agreement to give a lien, and the property covered thereby passes into the hands of a trustee in bankruptcy before any proceedings are taken to reform the instrument, the trustee takes it in the plight in which it then stood, and in such case the title remains in the bankrupt, but there is an outstanding equity in the mortgage.

[5] If not attended with fraud or bad faith, a mortgage to secure future advances, though not so expressed on its face, is valid, as between the parties and as against subsequent purchasers and incum-

brancers as well, so far at least in regard to advances made before the equities of subsequent purchasers or incumbrancers attached. Jones on Chat. Mortgages, § 9495; Kirby v. Raynes, 138 Ala. 194, 35 South. 118, 100 Am. St. Rep. 39.

[6] The second mortgage was properly executed, and was given to secure the commercial papers, and if they were acquired by the Birmingham Trust & Savings Company in due course, for value, before maturity, therefore as a bona fide holder, such bank is entitled to enforce the mortgage without regard to any defenses that might have been interposed by the mortgagor. We quote from 2 Jones on Mortgages, §§ 834, 835:

"When, therefore, the debt secured is in the form of a negotiable note, a legal transfer of this carries with it the mortgage security; and inasmuch as a negotiable promissory note by the commercial law, when assigned for value before maturity, passes to the assignee free of all equitable defenses to which it was subject in the hands of the payee, it does not lose this character which it has under the commercial law when it is secured by a mortgage. The mortgage rather is regarded as following the note, and as taking the same character; and it is the generally received doctrine that the assignee of a mortgage securing a negotiable note, taking it in good faith before maturity, takes it free from any equities existing between the original parties.

"Where the mortgage assigned secures a negotiable note, it does not matter that the consideration of the mortgage was wholly void, as where the consideration was the price of intoxicating liquors sold in violation of law, or that the mortgage was originally given without consideration. The negotiable note secured by the mortgage is valid in the hands of a bona fide indorsee for value without notice of the illegal consideration for which it was given. When the mortgage is assigned at the time when the note is indorsed, there is no principle or authority which makes the mortgage less valid than the note."

The assignee for value before maturity of negotiable paper and the mortgage to secure it cannot be affected by equities of which the assignee had no notice to which it would be subject in the hands of the mortgagee. Nat. Live S. Bank v. First Nat. Bank, 203 U. S. 296, 27 Sup. Ct. 79, 51 L. Ed. 192. And this is the rule in Alabama. In Thompson v. Maddux, 117 Ala. 468, 23 South. 157, it was held that, where a note secured by a mortgage is transferred, such mortgage follows the note, and is of the same character and governed by the same rules in respect to the right of the maker of the note and mortgage to set up equities and defenses against it in the hands of the transferee as purchaser.

[7] The trustee further insists that the mortgages constitute under section 4295 of the Code of Alabama a general assignment, because he says that they convey substantially all of the property subject to execution of the now bankrupt debtor, in payment of a prior debt, and that by such preference the payment was given to Connell & Baldwin, creditors, over the remaining creditors of the grantor, and that the mortgages were not given to secure a debt contracted contemporaneously with their execution. The Supreme Court of Alabama, in construing this section of the Code, has said:

"The statute is not intended to declare conveyances fraudulent or void, but simply to blot out intended preferences or priorities; effect is to be given to the instrument or to the transaction that would be given to it if the statute was

incorporated in the instrument or transaction as a part of it." Dadeville O. M. v. Hicks, 184 Ala. 371, 63 South. 971.

And undoubtedly, if uncontrolled by any statutory inhibition, a debtor, though insolvent, may make preferences among his creditors, paying one in full to the exclusion of the others; but this section of the Code converts such preference into a general assignment, if the conveyance embraces all or substantially all of the debtor's property. Goetter v. Smith, 104 Ala. 481, 16 South. 534; Bell v. Goetter, 106 Ala. 462, 17 South. 709.

[8] Whether or not the mortgages embrace substantially all of the debtor's property is subject to great doubt. Certainly they did not convey the leasehold estate in the place of business occupied by the bankrupt, which had several years to run, as well as the debts due to the bankrupt and its stock of goods on hand at the time the mortgages were executed; moreover, the trustee, who assumed the burden of showing that the mortgages embrace substantially all of the estate of the bankrupt, has not reasonably demonstrated that such was the case. However, this Alabama statute in my opinion is inapplicable, because the trustee is only empowered by the Bankruptcy Law to avoid transfers as for fraud or as preferences; and a proceeding under this statute does not contemplate an avoidance of the transfer, but an affirmance of it, so as to make it inure to all creditors alike.

[9] The trustee further contends that the mortgages are void under section 4293 of the Code of Alabama, which says that all instruments made to hinder, delay, or defraud creditors are void as to the creditors. Of course, this statute embraces nothing more than a well-settled common-law rule, established long before the Alabama enactment. In construing this statute the Supreme Court of Alabama, in Hall & Farley v. Ala. T. & I. Co., 143 Ala. 471, 39 South. 287, 2 L. R. A. (N. S.) 130, 5 Ann. Cas. 363, said that—

"It is of no importance to us whether the statute of 13 Elizabeth was the ordination of original law, or merely declaratory of existing common law in England. Whatever may be the solution of that somewhat mooted question, that enactment, antedating as it did the first English settlement in the territory now constituting the United States, and 'being applicable to our situation and not inconsistent with our institutions and government,' became a part of the common law of this country,   *   *   * " and that, "being a re-enactment of an English statute which was a part of the common law of this country, it has justly been held to be but declaratory of existing common law. Anderson v. Hooks, 9 Ala. 704, 709."

The trustee insists further that the mortgages are void under section 67e of the Bankruptcy Act (Comp. St. § 9651), because, as he alleges, they were made with intent to hinder, delay, or defraud creditors, in violation of the above-mentioned common-law rule, recognized in and made a constituent part of the Bankruptcy Act. Are the mortgages such a transfer of the bankrupt property which the creditor of the bankrupt might have avoided, or did the bank become a bona fide holder for value of the commercial papers, and the mortgages to secure their payment, on November 8, 1919, or prior to the date of the adjudication in January, 1920? If the bank is such holder, the referee in bankruptcy ruled correctly that it has against the trustee a superior

lien on the property covered by the mortgages for the sum of $7,500, with interest thereon. But it is urged by the trustee that the bank was not a bona fide purchaser for value of the commercial papers and mortgages, because the proceeds of the notes were discounted and placed to the credit of Connell & Baldwin, and that the evidence failed to show that all of such proceeds were drawn out of the bank by Connell & Baldwin, and cites Citizens' Nat. Bank v. Buckeit, 14 Ala. App. 511, 71 South. 82, 89, and Tatum v. Com. Bank & T. Co., 185 Ala. 249, 64 South. 561, where in the latter case it is said that—

"A bank does not become a purchaser in due course for value by crediting a note upon payee's account, if the credit is not absorbed by antecedent indebtedness or exhausted by subsequent withdrawals."

[10, 11] As was said in Swift v. Tyson, 41 U. S. (16 Pet.) 1, 18 (10 L. Ed. 865) the decisions of the local tribune upon the doctrine of commercial jurisprudence are entitled to the most deliberate attention and respect, but they cannot furnish positive rules or conclusive authority by which the judgments of the federal courts are to be bound and governed, and the ruling of the United States Supreme Court was to the same effect in Presidio County v. Noel-Young B. Co., 212 U. S. 59, 73, 29 Sup. Ct. 237, 53 L. Ed. 402. I think that the rulings made in these Alabama cases, which are embraced in the quotation from one of them, is not applicable to the case at bar. In 8 Corpus Juris, 483, it is stated to be—

"* * * well settled that a bank or a person, by discounting negotiable paper, placing the same to the credit of the depositor, honoring his checks or drafts, surrendering to him securities, or in some other manner making advances and extending its credit on the faith of such deposit, thereby becomes a holder for value."

This proposition is supported by many authorities cited in the footnote, including Amalgamated Sugar Co. v. U. S. Nat. Bank, 187 Fed. 746, 109 C. C. A. 494, Boardman v. Hanna (C. C.) 164 Fed. 527, Hatch v. N. Y. City, etc., 147 N. Y. 184, 41 N. E. 403, and Elmore County Bank v. Avant, 189 Ala. 418, 66 South. 509; and in the same work, at page 484, it is said:

"There is some authority, including dicta, to the effect that the credit given or the funds of the depositor on deposit in the bank, sufficient to pay the note on its dishonor, must have been exhausted; but these cases and dicta are against the weight of authority, which supports the rule that all of the credited deposit need not have been paid out, in order to make the transfer one for value, and also that it is immaterial whether or not the depositor has, or may have, funds in the bank exceeding the amount of the discounted note, provided, of course, the bank has, on the faith of the fact of the proceeds of such discount, made some advance, extended some credit, or done something else whereby it assumed a relation other than that of mere debtor and creditor."

The text is supported by many cited authorities, and Tatum v. Com. Bank, supra, is referred to as one of the cases that fall under the author's criticism.

[12] Connell, of the firm of Connell & Baldwin, testified that, at the time the notes were discounted with the bank, the indebtedness of his firm to the bank was something like $20,000, and that contempo-

raneously with the transaction, Connell & Baldwin paid to the bank, out of the proceeds of the discounted paper, $3,965.33 on account of its indebtedness to the bank which had, then matured. From the evidence there can be no doubt that the whole amount of the proceeds of the discounted notes were absorbed by the bank on account of the indebtedness of Connell & Baldwin prior to the adjudication and were paid out by the bank in the many daily transactions had between it and Connell & Baldwin prior to the bankruptcy. In Sherrill v. Mer. & Mech. Trust & S. Co., 195 Ala. 175, 70 South. 723, the Supreme Court of Alabama said:

"A bank does not become a bona fide purchaser for value and without notice of a negotiable paper by simply discounting it for one not its debtor at the time and placing the amount to the credit of the holder by way of deposit. In such circumstances the act of discounting and of crediting only effects to establish the relation of debtor and creditor between the depositor and the bank; but, if the amount deposited to the checking account of the customer is exhausted before maturity, or before notice of any defect, then the bank is a purchaser for value."

[13] So that, even under the rule recognized by the Alabama decisions, the bank was a purchaser for value, since the whole amount of the deposit was exhausted before the bankruptcy, and before notice to the bank of any infirmity in the paper. It seems clear that the bankrupt and Connell & Baldwin did not intend to create a preference discountenanced by the law, but that the real purpose in giving the notes and mortgages was to pay the running account for flour and other supplies furnished to the baking company, and to obtain additional supplies to keep the bakery business in operation. The directors of the bankrupt and Connell & Baldwin believed, and had apparent good reason to believe, that the concern would be tided over a temporary embarrassment, and would, by the advancement made by Connell & Baldwin, be able to continue business and preserve the estate. Connell & Baldwin subtracted nothing from the assets of the estate when they took the papers from the baking company. On the contrary, they added to the estate, by furnishing flour, lard, etc., for its operation, in harmony with the major purpose of making the notes and mortgages. To constitute a preferential transfer within the meaning of the Bankruptcy Act, there must be a parting with the bankrupt's property for the benefit of the creditor and a consequent diminution of the bankrupt's estate. Continental & Commercial Trust & Savings Bank v. Chicago Title Co., 229 U. S. 435, 445, 33 Sup. Ct. 829, 57 L. Ed. 1268.

[14] It may be true that there was included in these conveyances a large amount of the property of the bankrupt, but the transaction was in good faith, with a view of preserving the estate and enabling it to continue as a going concern and to meet its indebtedness. Such conveyances were valid at common law, from which this feature of the act (section 67e) was taken, and, while Congress in the Bankruptcy Act strikes down preferential conveyances, where the party has good reason to believe that a preference is intended, Congress has not declared voidable merely preferential conveyances made in good faith,

if the grantee, as in the present case, was ignorant of the insolvency of the grantor and had no reason to believe that a preference was intended. Coder v. Arts, 213 U. S. 223, 29 Sup. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 108. The notes and mortgages were given in part as payment on a running account for supplies furnished and to be furnished to the bakery to keep it in operation. Payments on a running account, where new sales succeed payments, and the net result is to increase the value of the estate, do not constitute preferential transfers under section 60a (Comp. St. § 9644). Jaquith v. Alden, 189 U. S. 78, 83, 23 Sup. Ct. 649, 47 L. Ed. 717.

I find that, in giving the commercial papers and the mortgages to secure them, there was no intent on the part of the bankrupt or Connell & Baldwin to defraud the creditors of the bankrupt; also that the bank in purchasing the notes had no intent to defraud, and had no knowledge of any intent on the part of Connell & Baldwin to defraud, the creditors. Under the facts in this case, the mortgages ought not to be set aside, since the amount derived from the discount of the papers by the bank was used in part to pay an existing indebtedness due at the time to the bank, particularly as the residue of the proceeds were eventually checked out in the usual course of business, as above stated. Van Iderstine v. Nat. Discount Co., 227 U. S. 577, 583, 33 Sup. Ct. 343, 57 L. Ed. 652. There were no infirmities on the face of the papers. The bank had no knowledge of any defense thereto. There were no circumstances which required the bank to make inquiry, Connell & Baldwin had the right to sell and transfer the papers to the bank, and the bank became the holder and transferee of the notes and mortgages in the usual regular course of its banking business. It is said in Goodman v. Simonds, 61 U. S. (20 How.) 343, 364, 365 (15 L. Ed. 934), that—

"A well-defined and correct exposition of the rights of a bona fide holder of a negotiable instrument was given by this court in Swift v. Tyson, 16 Pet. 1, as long ago as 1842; and we adopt that exposition relative to the point under consideration on the present occasion, as one accurately defining the nature and character of the title to those instruments which such holder acquires when they are transferred to him for a valuable consideration. This court then said, and we now repeat, that a bona fide holder of a negotiable instrument for a valuable consideration, without notice of facts which impeach its validity between the antecedent parties, if he takes it under an indorsement made before the same becomes due holds the title unaffected by these facts, and may recover thereon, although, as between the antecedent parties, the transaction may be without any legal validity. That question was not one of new impression at the date of that decision, nor was it so regarded either by the court or the learned judge who gave the opinion; on the contrary, it was declared to be a doctrine so long and so well established, and so essential to the security of negotiable paper, that it was laid up among the fundamentals of the law, and required no authority or reasoning to be brought out in its support; and the opinion on that point was fully approved by every member of the court, and we see no reason to qualify or change it in any respect."

[15] This court will follow what I think is the weight of authority, and declare that the Birmingham Trust & Savings Company was a bona fide purchaser for value in discounting the negotiable papers and the mortgages to secure them, as the bank gave full credit by depositing

to the account of such firm the face value of the papers less the small discount charge; the bank paid out on checks of Connell & Baldwin $3,965.33 contemporaneously with the discounting of the notes and prior to the institution of the bankruptcy proceedings from time to time to Connell & Baldwin, on their daily running account, a sum greater than that derived from the discounted notes. And it is familiar law that the holder of negotiable paper acquired for value before its maturity is not bound to prove that he is a bona fide holder without notice, for the law will presume that in the absence of proof to the contrary, and therefore the onus is upon the defendant (here the trustee has assumed such place) to establish by way of satisfactory proof the contrary and thus overcome the prima facie title of the holder. Swift v. Tyson, supra; Security Bank of Minn. v. Petruschke, 101 Minn. 478, 112 N. W. 1000, 118 Am. St. Rep. 644; Dreilling v. First Nat. Bank, 43 Kan. 197, 23 Pac. 94, 19 Am. St. Rep. 126; Amalgamated Sugar Co. v. U. S. Nat. Bank, 187 Fed. 746, 109 C. C. A. 494.

After careful consideration of the pleadings, the testimony, and the argument of the attorneys, I am of the opinion that the ascertainment of facts by the referee and his conclusions of law are correct, and that the Birmingham Trust & Savings Company has a superior lien upon the property covered by the mortgages for the sum of $7,500, with interest thereon from November 6, 1919; and inasmuch as the property has heretofore been sold under the order of the court free of the mortgage lien, and produced a sum greater than the amount of the principal and interest, that the lien was transferred from the mortgaged property to the proceeds derived from the sale thereof; and therefore the trustee in bankruptcy must, out of the proceeds of such sale, pay the Birmingham Trust & Savings Company such principal sum of $7,500, with interest thereon from November 6, 1919.

Appropriate order will be entered.