### In re WILL V. CONNELL CO.

(District Court, N. D. Alabama, S. D.   October 15, 1921.)

No. 18085.

1. **Bankruptcy ⬅303(3)—Evidence held not to show that claimants had notice of bankrupt's insolvency when purchasing goods.**

In a trustee's proceeding before referee in bankruptcy to set aside a transaction as a voidable preference, evidence *held* to show that the claimants had no notice, or knowledge of any facts sufficient to put them on notice, that the bankrupt was insolvent when the goods were delivered to them.

2. **Bankruptcy ⬅303(1)—Trustee, to have transaction declared a preference, must prove bankrupt knew of his insolvency and that claimants had notice thereof.**

In a trustee's proceeding before a referee to avoid a sale as a preference, the trustee assumed the burden of showing, not only that the bankrupt knew of his insolvency, but that the claimants, alleged to be the recipients of preferences, had notice or knowledge of bankrupt's insolvency when the goods were delivered.

3. **Bankruptcy ⬅303(3)—Evidence held not to show that claimants acquired more property by purchase than sufficient to satisfy their respective acceptances.**

Evidence *held* insufficient to show that the claimants acquired more property on the face of their purchase from the bankrupt than was sufficient to satisfy their respective acceptances.

4. **Sales ⬅210—Finding that no article was separated from the mass was erroneous, where goods were placed in warehouse and certificates issued to buyers.**

Where bankrupt sold goods to claimants and had them transferred to a warehouse, and uniform warehouse receipts drawn under Acts Ala. 1915, p. 661 et seq., delivered to claimants, a referee's finding that claimants had bought no specific article, and that none was separated from the mass of property, so as to pass title, was error, particularly in view of Acts Ala. 1915, p. 666, § 23, relating to warehousemen mingling fungible goods.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. Bankruptcy ⚷⟹165(3)—Buyers, taking goods under lawful trade accept-ances, paying for them, they being delivered through a warehouse by receipts, was not a voidable preference.**

Where claimants, buyers, executed lawful acceptances approximately 30 days before delivery of the goods, payable to the bankrupt's order, and subsequent to the receipt of the money and prior to bankruptcy, the bankrupt delivered the goods due through a warehouse and warehouse receipts, the bankrupt's creditors enjoyed the fruits of the money, and the trustee cannot seize such goods as a voidable preference.

In Bankruptcy. In the matter of the Will V. Connell Company, a corporation, bankrupt. On petition by the Central Grocery Company and others for a review of an order and decree by the referee, declaring a voidable preference. Order annulled and set aside, and claimants, the petitioners here, will by proper decree be granted their just relief.

Wood & Pritchard and Thomas J. Judge, all of Birmingham, Ala., for claimants.

Rudulph & Smith, of Birmingham, Ala., for trustee.

CLAYTON, District Judge. This matter is before me on the petition of the Central Grocery Company and others for review of the findings and decree and order of the referee made on September 10, 1921.

[1] The referee held that:

"2. With notice of then insolvency, of the bankrupt; and if such purchase were allowed to stand, he would thereby receive a voidable preference; and further

"3. Having attempted to make such purchase, with notice of such insolvency, the transaction in each instance was fraudulent and void as against the trustee in bankruptcy, for the reason, among others, that the claimant acquired more property on the face of the transaction than was sufficient to satisfy the respective acceptances, for which the claim is made that the goods were to be in payment."

He based these conclusions upon the theory that the petitioners had notice of the insolvency of the bankrupt, and therefore to allow their claims would be to give validity to a voidable preference, and that the claims of the petitioners are fraudulent and void as against the trustee in bankruptcy because, as he concludes, with notice of such insolvency "the transaction" in the instance of each claimant "was fraudulent and void."

A careful study of the evidence convinces me that the claimants had no notice or any knowledge of any facts sufficient to put them on notice that the bankrupt was insolvent when the goods were delivered to them. The testimony convinces me that the bankrupt himself did not know or believe he was insolvent at the time the goods, the subject-matter of the litigation, were delivered to these claimants. See pages 21, 22, 23, 24, 25, and 35 of the record of the testimony.

[2] Moreover, the trustee assumed the burden of going further than this, for it was incumbent upon him to show, not only that the bankrupt knew of his insolvency, but to prove that the claimants, alleged

⚷⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to be recipients of preferences, had notice or knowledge of the bankrupt's insolvency at the time the goods were delivered to them. To me it seems clear that the bankrupt did not realize his insolvency, and that no notice of his insolvent condition was ever brought home to the claimants, these petitioners. See the testimony of Rose Schillicci, pages 3 and 4 of the record. The other claimants testified substantially as Schillicci did. Each of them denied having any notice of the bankrupt's insolvency until the petition in bankruptcy was filed. It may be added that the trustee offered no evidence that any of the claimants had notice of the bankrupt's insolvency, and also it is to be said that the trustee failed to show that the bankrupt himself knew of the insolvency at the time the goods in question were delivered.

The testimony shows that each of the claimants were small retail grocers whose entire time was taken up with the operation of their stores. The bankrupt was a wholesale grocer and broker, having large well-stocked storehouses in the wholesale district of Birmingham. The retail grocery stores of claimants were located, one at Bessemer, one at Brighton, one at Pratt City, and one at Ensley, all small towns some miles distant from the bankrupt's place of business. The bankrupt as wholesale grocer was selling goods to retailers. This relationship, however, could not have put the retailer on inquiry as to the financial condition of the wholesaler, especially in view of the fact that the goods were sold at open market prices. It is not pretended that any of the flour or lard was ever sold to any one of the claimants for less than the prevailing open market prices. The testimony is convincing that all of the goods were sold at the prevailing prices.

[3] A careful consideration of the evidence convinces me that the claimants did not acquire more property on the face of the transaction than was sufficient to satisfy their respective acceptances. However material or immaterial may have been this finding or observation of the referee, it is not supported by the evidence. I find the transactions of each claimant with the Will V. Connell Company to have been fair, open, and honest. Each transaction was had in the due course of business. No fraud, actual or constructive, whatever was perpetrated by any one of the claimants.

I am clearly of the opinion, from the evidence, that the referee erred in his second and third findings of facts and his conclusions thereon. Tumlin v. Bryan, 165 Fed. 166, 91 C. C. A. 200, 21 L. R. A. (N. S.) 960; Roseman v. Coppard, 228 Fed. 114, 142 C. C. A. 520. Both of these cases were decided by the United States Circuit Court of Appeals for the Fifth Circuit.

[4] The other question in the case is the conclusion of the referee upon the undisputed evidence in the case. The referee found:

"1. That no one of the claimants made purchase of any specific article, and no specific article was separated from the mass of the property so as to give the claimants title thereto."

I have no doubt that he erred in this conclusion. The evidence touching this point consisted of warehouse receipts made out to each of the claimants, describing with particularity the amount of flour and lard claimed by each of the petitioners in these proceedings. The re-

ceipt in each case was issued by the Harris Transfer & Warehouse Company of Birmingham and accepted by the claimants prior to the bankruptcy. These receipts are in regular form, "uniform warehouse receipts," drawn in compliance with the provision of the act "to make uniform the law of warehouse receipts," etc. Acts of Alabama 1915, p. 661 et seq. The receipt in each case is signed by the warehouse company by its agent and also by the claimant. Each claimant's particular property is described in his receipt.

The evidence showed that during the month of January, or 30 days or more prior to the bankruptcy, each of the claimants executed separate trade acceptances due approximately 60 days after date, to cover the purchases of flour and lard made by the claimants, the petitioners, from the bankrupt. These trade acceptances were immediately discounted by the Birmingham Trust & Savings Bank, the bank with which the bankrupt did business, and the cash was then placed to the credit of the bankrupt. The money thus obtained by the bankrupt was used by it in the due and regular conduct of its business. About 30 days after the bankrupt had obtained the money upon the trade acceptances, the bankrupt "phoned" each of the respective claimants that it expected a large shipment from the "Hazel Milling Company" upon consignment, and that their flour was in its warehouse, and that the bankrupt needed its warehouse space and desired claimants to remove their flour at once. The claimants' stores were small and some miles distant from the bankrupt's store, and it was not convenient for them to take the flour at once; thereupon, at the suggestion of the bankrupt, the bankrupt caused all and each of the claimants' flour to be hauled to the public warehouse of the Harris Company, and there stored separately in the name of each of the respective claimants, causing uniform warehouse receipts to be issued to each claimant, describing thereon the specific property stored in the warehouse. These receipts were at once delivered to the claimants. There was no fraud, collusion, or bad faith between the warehouse company and the bankrupt, or between the warehouse company and any of the claimants. On this hearing it was not asserted that there was any fraud in fact. However, the referee concluded that "no specific article was separated from the mass of the property, so as to give the claimant title thereto."

Upon the evidence in this case I am forced to conclude that this finding of the referee was erroneous, and not based upon any evidence or facts. The evidence shows that the flour and lard described in the respective receipts was delivered to the public warehouse, and there stored and held for the purchasers who had previously paid for such goods. To each claimant a separate uniform warehouse receipt was issued, describing his specific property. These facts constituted a completed sale and delivery of the goods to each claimant. It is not true that the purchasers were unable to identify their specific property, for the facts show that some of the claimants did go to the warehouse, present their receipts, and withdraw from the warehouse part of the flour as it was needed by them in their retail business, prior to the bankruptcy of the Will V. Connell Company, the bankrupt here.

The bankrupt had no right, legal or equitable, to disturb the claim-

ants in the enjoyment of the merchandise it had sold and delivered to them; especially so in view of the fact that the bankrupt had collected all of the purchase price for the goods prior to their delivery. It cannot be maintained that the trustee has any greater right in this case than the bankrupt had. The rights of the trustee are as those of a judgment creditor only as of the bankrupt. As I have said, these goods were sold, delivered, and the money collected therefor some days prior to the bankruptcy; and all of the dealings and transactions had by and between the claimants and the bankrupt and the claimants and the warehouse storage company were regular, and without any taint of or even suspicion of fraud. Upon the day these claimants' merchandise was delivered to them at the warehouse there was no judgment creditor to complain, and no other one occupying such position. The bankrupt had no control over the flour and lard after it was delivered to the warehouse company. The claimants had no control over it until the warehouse receipts were presented, storage charges paid, and delivery demanded. Manifestly, therefore, it was immaterial as to how the goods were stored by the warehouse company in its warehouse. The company was compelled to deliver to each respective claimant the specific flour and lard called for in each individual receipt upon demand. This is elementary common law.

However, the goods in the present case were fungible goods, and as to such the Alabama act provides that:

"23. If authorized by agreement or by custom, a warehouseman may mingle fungible goods with other goods of the same kind and grade. In such case the various depositors of the mingled goods shall own the entire mass in common and each depositor shall be entitled to such portion thereof as the amount deposited by him bears to the whole." Acts of Alabama 1915, p. 666.

In construing a similar section of the statutes of Iowa, Judge Wade of the District Court said:

"Under Code Supp. Iowa 1913, § 3138a23, a warehouseman may mingle grain or products covered by outstanding warehouse receipts with other grain or products of like grade, whether owned by the warehouseman or third parties, and it will not constitute conversion or confusion of goods."

This case was affirmed by the Circuit Court of Appeals. Central State Bank v. McFarlin, 257 Fed. 535, 168 C. C. A. 519. The court said (257 Fed. 537, 168 C. C. A. 521) that:

"The certificates cover wheat and products. Appellant bank claims that this was legal under the Iowa statutes, and we shall assume, without deciding, that this is so. No specific proportion between wheat and products is mentioned. Under the statutes of Iowa the warehouseman had the right to mingle the wheat and products thus belonging to the bank with other wheat and products of like grade, whether belonging to the warehouseman or to third parties. This did not constitute conversion, nor confusion of goods."

See Macy v. Roedenbeck, 227 Fed. 346, 142 C. C. A. 42, L. R. A. 1916C, 12.

In the absence of such a statute it is to be observed that under general law when the bankrupt (the vendor), pursuant to an agreement with the claimants (the vendees), delivered the goods previously sold to claimants at the Harris Transfer & Warehouse Company, and caused warehouse receipts to be issued therefor in the name of each of the

claimants (the vendees), and when said warehouse receipts were accepted pursuant to said agreement by the claimants, these acts constituted a completed sale and delivery of such goods. The law is stated in 35 Cyc. 191, 193, in the following language:

"As a general rule, in the absence of a contrary agreement, the seller is not bound to send or carry the goods to the buyer; but he fulfills the obligations by leaving or placing them at the buyer's disposal, so that he may remove them without lawful obstruction, especially if manual delivery is impracticable, because of the bulk of the articles, in which case it is sufficient if the goods are pointed out to the buyer or he is told to take them away, or the goods being at a distance from the place of sale, the buyer is told to go and take them. And when goods are manufactured by the buyer, it is a sufficient delivery if when completed they are set apart and placed at the disposal or subject to the orders of the buyer. But the goods must be so placed that the buyer has access to them for the purpose of taking possession.

"It is not necessary that the exact quantity should be segregated to constitute such selection and delivery, but mere selection and segregation will not operate as delivery if in fact the conduct of the parties is such that no intent of the seller to surrender dominion can be inferred. If the buyer is present and then and there agreed that he is entitled to take away from the common mass the quantity sold. weight and measure are not essential to a valid delivery. And when specific articles are sold if they are marked as purchased by the buyer and set aside for him this is such an appropriation as will constitute a delivery.

"Ordinarily a delivery of goods by the seller to the carrier designated to the purchaser or to one usually employed in the transportation of goods from the place of the seller to that of the purchaser, is a delivery to the purchaser, the carrier becoming the agent or bailee of the buyer."

I am clearly of the opinion from the evidence in this case and from the terms of the warehouse receipts themselves that the warehouse company, when the goods described in the respective receipts were received by them, immediately became both the agent and bailee of the claimants, and therefore, as a matter of law, this consummated a perfected sale and delivery of the goods to the respective claimants.

[5] Now, taking another view of the case, there is no doubt from the evidence that the bankrupt estate was not in any way depleted by the transaction had with these claimants and sought to be impeached by the trustee. The claimants executed lawful acceptances approximately 30 days before the delivery of the goods in question, payable to the order of the bankrupt. Such trade acceptances, operating in the same way as here, were dealt with in the case of In re Grocers' Baking Co., 266 Fed. 905, where the District Court said:

"If not attended with fraud or bad faith, a mortgage to secure future advances, though not so expressed on its face, is valid, as between the parties, and as against subsequent purchasers and incumbrancers as well, so far at least in regard to advances made before the equities of subsequent purchasers or incumbrancers attach."

On appeal this case was affirmed, and specific reference made to the opinion from which the above quotation is taken. The trade acceptances secured by the mortgage in the preceding quotation were for goods to be delivered in the future, and here, as in the Grocers' Baking Co. Case, all the goods due claimants under the trade acceptances in question were delivered to them prior to the bankruptcy, and there-

fore prior to the accrual of equities of subsequent purchasers or incumbrancers.

Here the bankrupt discounted the claimants' trade acceptances exactly as was done in Re Grocers' Baking Co. It received in return for the acceptances their full face value, and used the money thus obtained in the proper and ordinary course of its business. Subsequent to the receipt of the money, and prior to the bankruptcy, the bankrupt delivered to the claimants the goods due under and by virtue of the terms of the trade acceptances. The bankrupt received full pay for the merchandise now claimed by these petitioners. All the creditors of the bankrupt estate enjoyed the fruits of their money put into the bankrupt estate. And again it was held in Re Grocers' Baking Co., supra, that:

"To constitute a preferential transfer within the meaning of the Bankruptcy Act there must be a parting of the bankrupt's property for the benefit of the creditor and a consequent diminution of bankrupt's estate." Continental & Com. T. & S. Bank v. Chi. Title Co., 229 U. S. 435, 445, 33 Sup. Ct. 839, 57 L. Ed. 1268, 30 Am. Bankr. Rep. 624, 628.

The petitioners paid for the goods they now claim prior to the bankruptcy, and the goods were delivered to their bailee, the warehouse company, prior to the bankruptcy. The trustee is without right to interfere with the claimants in the enjoyment of their property thus lawfully acquired. The effort of the trustee to impeach the transactions in the present case cannot be countenanced by a court of equity. He had no better right to interfere with the claimants' goods stored in a public warehouse than he would have had to recover from the claimants the goods in question, had they been delivered to them and placed in their own storehouses.

Accordingly, the order and decree of the referee, made on September 10, 1921, will be annulled and set aside, and the claimants, the petitioners here, will by proper decree be given their just relief.