**In re FULGHUM CONSTRUCTION COMPANY, Debtor.**

**Robert H. WALDSCHMIDT, Trustee, Plaintiff,**

**v.**

**Harry H. RANIER, Algin H. Nolan, Ranier & Associates, Egan Iron Works, First Security National Bank of Lexington, and Liberty National Leasing Company, Defendants.**

Bankruptcy No. 380–00235.
Adv. No. 380–0081.

United States Bankruptcy Court, M. D. Tennessee.

Nov. 28, 1980.

See also, Bkrtcy., 5 B.R. 53.

Robert H. Waldschmidt, C. Kinian Cosner, Jr., Nashville, Tenn., for plaintiff.

John H. Bailey, III, L. Wearen Hughes, Nashville, Tenn., for defendants Harry H. Ranier, Algin H. Nolan, and Ranier & Associates.

William L. Montague, Charles E. Shivel, Jr., Lexington, Ky., for defendant First Security Nat'l Bank of Lexington.

David Stosberg, Louisville, Ky., for defendant Liberty National Leasing Co.

## MEMORANDUM

RUSSELL H. HIPPE, Jr., Bankruptcy Judge.

In this adversary proceeding involving numerous substantial transactions between the debtor corporation and its sole shareholder, Ranier & Associates, a partnership composed of Harry H. Ranier and Algin H. Nolan, general partners, the court has previously entered a partial judgment disposing of the rights of the trustee and the defendants in certain equipment that had been sold by the debtor to the shareholder. *Waldschmidt v. Ranier*, 5 B.R. 53, (Bkrtcy. M.D.Tenn. 1980).[1] As noted in paragraph 13 of the memorandum entered on July 14, 1980, there were almost one hundred transactions between the shareholder and the debtor during the period June 1978 through November 1979, when the debtor ceased doing business. As a result of the shareholder's purchase of the equipment, the shareholder became indebted to the debtor for a period of time. On June 5, 1979, however, an advance made to the debtor by the shareholder rendered its aggregate advances in excess of its obligations to the debtor, and thereafter the debtor was indebted to the shareholder in varying amounts. At present the debtor owes the shareholder the sum of $387,844.16. Most of the advances made by the shareholder subsequent to June 5, 1979, were in the form of deposits made to cover the debtor's payroll to ensure completion of jobs in progress. Generally, payments that the debtor received from these jobs were applied to the indebtedness to the shareholder. In entering the partial judgment in July, the court continued under advisement the issue of whether payments made by the debtor subsequent to June 5, 1979, constituted voidable preferences under § 547(b)[2] of the Bankruptcy Reform Act of 1978. All of the payments were made within one year prior to the filing of the involuntary petition on January 25, 1980.

The shareholder does not dispute that these payments made were transfers of the debtor's property as required by § 547(b). The shareholder asserts that it was not a creditor of the debtor, that the transfers were not in payment of antecedent debts owed to it, that the debtor was not insolvent at the time of the transfers, that the shareholder had no reasonable cause to believe that the debtor was insolvent at the time of the transfers, and that, even if the transfers are characterized as voidable preferences, they come within the exceptions provided by § 547(c)(1), (2), (4).

### Transfer to or for the Benefit of a Creditor under § 547(b)(1)

■ The Bankruptcy Reform Act of 1978 [hereinafter referred to as the Code to dis-

---

1. The court wishes to take this opportunity to correct a nonmaterial error in the first memorandum. In paragraph 12 at page 6 the court indicated that the secured creditors had perfected their security interests in the equipment sold by the debtor to the shareholder with appropriate filings in Kentucky. This was inaccurate as to the motor vehicles titled in Tennessee. The secured creditors' liens were not noted on the Tennessee title certificates, which had not been transferred to the shareholder. These security interests of the secured creditors' thus do not appear to have been properly perfected. Perfection of the security interests was not an issue, however. The trustee did not assert that he had any interest in any of the equipment as a creditor of the shareholder's.

2. Section 547(b) provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (1979).

tinguish it from the prior Bankruptcy Act of 1898] includes in its definition of "creditor" an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(9)(A). The Code defines "claim" as a

> right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, secured, or unsecured. . . .

11 U.S.C. § 101(4)(A). The legislative history of § 101(4) indicates that the drafters intended by it to provide the "broadest possible definition":

> the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.

S.Rep.No. 95–989, 95th Cong., 2d Sess. 22 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787; H.R.Rep.No. 95–595, 95th Cong., 1st Sess. 309 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

It is readily apparent that the shareholder was a creditor of the debtor's for the purpose of § 547(b).

### Antecedent Debt under § 547(b)(2)

■ The Code defines "debt" as a "liability on a claim." 11 U.S.C. § 101(11). The legislative history of § 101(11) indicates that the terms "debt" and "claim" are coextensive and that the debtor owes a debt to the creditor to the extent that the creditor has a claim against the debtor. S.Rep.No. 95–989, 95th Cong., 2d Sess. 23 (1978); H.R. Rep.No. 95–595, 95th Cong., 1st Sess. 310 (1977).

At all times subsequent to June 5, 1979, the debtor was indebted to the shareholder. Thus each of the transfers from the debtor to the shareholder was "for or on account of an antecedent debt owed by the debtor before such transfer was made."

### Insolvency of the Debtor under § 547(b)(3)

Section 547(b)(3) requires a showing that, at the time of the transfer that is sought to be avoided, the debtor was insolvent. Although section 547(f) provides a presumption of insolvency during the 90 days prior to filing, the trustee still has the ultimate burden of persuasion, the presumption merely requiring that the party against whom it exists to come forward with some evidence to rebut it. S.Rep.No. 95–989, 95th Cong., 2d Sess. 89 (1978); H.R.Rep.No. 95–595, 95th Cong., 1st Sess. 375 (1977); 4 Collier, Bankruptcy ¶ 547.26 (15th ed. 1980).

Section 101(26)(A) defines "insolvent" with reference to an entity other than a partnership as

> financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—
>
> > (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
> >
> > (ii) property that may be exempted from property of the estate under section 522 of this title; . . . .

The Code thus retains the balance–sheet test of insolvency of the prior Bankruptcy Act of 1898, as amended, [hereinafter referred to as the Act to distinguish it from the Bankruptcy Reform Act]. S.Rep.No. 95–989, 95th Cong., 2d Sess. 25 (1978); H.R. Rep.No. 95–595, 95th Cong., 1st Sess. 312 (1977); 4 Collier, Bankruptcy ¶ 547.26.

■ The party seeking to void a preference thus must establish the fair valuation of all of the debtor's assets at the time of the transfer. See Levit, *The Archaic Concept of Balance Sheet Insolvency*, 47 Am. Bankr.L.J. 215, 219 (1973). The cases under the prior Act established that "fair valuation" signified the reasonable estimate of what could be realized from the assets by converting them into, or reducing them to, cash under carefully guarded, if not ideal, conditions. *Hunter Press, Inc. v. Connecticut Bank & Trust Co.*, 420 F.Supp. 338, 341 (D.Conn.1976); *In re Alexandria Sand and Gravel Co.*, 17 C.B.C. 11, 16 (S.D.Ohio 1978) (B.J.); 1 Collier, Bankruptcy ¶ 1.19[3] (14th ed. 1974). Fair valuation was held by the courts not to be synonymous with a dis-

tressed or forced sale price. *Hunter Press, Inc. v. Connecticut Bank & Trust Co.*, 420 F.Supp. 338, 341 (D.Conn.1976); *Darby v. Shawnee Southwest, Inc.*, 399 F.Supp. 587, 591 (W.D.Okl.1975). The proper standard applied under the former Act was that enunciated in *Syracuse Engineering Co. v. Haight*, 110 F.2d 468, 471 (2d Cir. 1940):

Fair valuation of an estate such as this might conceivably be based on forced sale prices, or on fair market prices, or on so–called intrinsic values, irrespective of sale. A proper regard for the interests of the bankrupt, as well as for the interests of his creditors, compels the conclusion that fair market price is the most equitable standard. Bonbright and Pickett, Valuation to Determine Solvency under the Bankruptcy Act, 29 Col.L.Rev. 582, 597, 598; 1 Collier on Bankruptcy (14th ed. 1940) 74–81, collecting cases. It involves a value that can be made available for payment of debts within a reasonable period of time. *In re United Finance Corp.*, supra [104 F.2d 593 (7th Cir. 1939)]; *Babbitt v. Read*, 2 Cir., 236 F. 42, 47, *certiorari denied* 243 U.S. 648, 37 S.Ct. 475, 61 L.Ed. 946; *Stern v. Paper*, D.C. N.D., 183 F. 228, 230, 231, affirmed 8 Cir., 198 F. 642. And fair market value implies not only a "willing buyer," but a "willing seller." *Grandison v. National Bank of Commerce*, 2 Cir., 231 F. 800, 804, *certiorari denied* 242 U.S. 644, 37 S.Ct. 213, 61 L.Ed. 542; *Irvin Trust Co. v. Manufacturers' Trust Co.*, D.C.S.D.N.Y., 6 F.Supp. 185; Collier, supra at 77.

■ The fair value of the debtor's property may be established from balance sheets, financial statements, appraisals, expert testimony, and other affirmative evidence. *Edmondson v. Caldwell (In re Phippens)*, 4 B.R. 155, 159 (Bkrtcy.M.D.Tenn. 1980). Reduction in the face value of the debtor's assets may be appropriate if those assets are not susceptible to liquidation and thus cannot be made available for the payment of debts within a reasonable time. *Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573 (1st Cir. 1980).

The legislative history of § 547 does not reveal any intention on the part of Congress to change the state of the law relating to proof of insolvency that was in effect under the former Act.

■ The trustee's proof consisted of a series of corporate balance sheets; the testimony of Nolan, a certified public accountant who was one of the shareholder's two general partners; the testimony of the debtor's former president; and that of its former secretary–treasurer, James Gray. The shareholder's proof consisted principally of the testimony by Charles Linden, a certified public accountant who had prepared certain of the debtor's balance sheets.

The corporate balance sheet for the month ending September 30, 1979, indicates that the debtor's liabilities exceeded its assets by more than $230,000. The corporate balance sheet for the previous month was not introduced. The balance sheets for the months ending June 30, 1979, and July 31, 1979, indicate that the debtor's assets exceeded its liabilities. Among the assets included in these two balance sheets are amounts for "equity in jobs." The trustee asserts that the amounts for "equity in jobs" should be disregarded in determining whether the debtor was solvent and that, as a result, the court should find that the debtor was insolvent during June 1979, when the shareholder's status shifted from that of a debtor to that of a creditor of the debtor's.

The debtor used the completed–contract method of accounting, as opposed to the percentage–of–completion method. The completed–contract method recognizes income only on completion or substantial completion of long–term construction contracts, while the percentage–of–completion method recognizes revenues when the earning process is complete or virtually complete and an exchange has taken place. M. Miller, Generally Accepted Accounting Principles Guide 27.01–27.02 (1979). In accounting for long–term construction contracts under the completed–contract method,

excess of accumulated costs over related billings should be reflected in the balance

sheet as a current asset, and excess of accumulated billings over related costs should usually be reflected as a current liability. In the case of more than one contract, the accumulated costs or liabilities should be separately stated on the balance sheet. The preferred terminology for the balance sheet presentation should be "(Costs) (Billings) of uncompleted contracts in excess of related (billings) (costs)."

*Id.* at 27.01. At interim balance–sheet dates, the excess of either the overhead and direct costs or the credit billing and/or cash received over the other is classified as a current asset or a current liability, because of the normal operating cycle concept. *Id.* at 27.02. The interim–balance–sheet treatment of long–term contracts under the completed–contract method is the same as that under the percentage–of–completion method, except that under the latter, the amount of estimated gross profit earned in each period is recorded by charging a construction–in–progress account and crediting realized gross profit. *Id.* at 27.03.

The debtor's secretary–treasurer, Gray, prepared all of the data that appear on the balance sheets and forwarded the information to Nolan. Nolan reviewed the information and forwarded it to the computer center, which printed out the balance sheets. Exhibit L (Nolan Deposition) 33. When asked to explain the term "equity in jobs" as it appears on the balance sheets, Gray responded:

A. Well, to me, it would be the amount of money that we invested in the particular job that was in progress at that time.

Q. So it was money which was actually invested into a job, not money which the corporation had. Is that correct?

A. That's right.

Q. And in order for the corporation to get any asset or any value out of that particular asset, it would have to complete the job in the future. Is that correct?

A. Yes, sir. Mm–hmm.

Q. If the company were to stop at any one point in time, according to that sheet, according to that financial statement, is there any way that the company could realize the amount of money stated in that figure of equity in the job?

A. Not according to this statement here, no.

.     .     .     .     .

Q. Would this figure of equity in jobs be expected funds to be received in the future, expected income, expected profit from future operations of the business?

A. Well, it would–. No, not exactly because the job–you could have equity in the job, and still the job might end up as a profit or a loss. This would, to me, it would tell you that you had this much money invested in this job at that particular time. And that has no relationship to the final outcome of the job as far as profit is concerned.

1 Trial Transcript 91–92. In response to a similar inquiry during his deposition on April 9, Nolan testified:

A. . . . The equity in jobs arise from matching the amount of cash that has been received from a particular job against the amount that has been spent on that particular job.

Q. Now, explain that again. Would that be actual assets money in the bank or–

A. No.

Q. That would be expected profit from a particular job?

A. No. All this is, is Mr. Gray had schedules, which are in the financial statements that I am showing you here, showing how much had been spent on a particular job and how much cash that he had received against that particular job. And that's all this is. It doesn't having anything to do with whether there is going to be a profit or a loss.

In this particular instance, since it is a debit and not a credit, if all of the jobs were terminated and all of the money was in, this would reflect a loss of five sixty–nine.

Q. So, you did not actually have that asset at the time the statement was pre-

pared? It was more or less just a figure which was put in there to reflect at what stage a particular job in progress was?
A. That's right. Just a matching process of the expenses spent to date and the cash received to date. Not the income, but the cash received. And it didn't reflect, really, whether there was a profit or a loss in the job.
Q. So, if the corporation were halted on June 30 of 1979 and all of the assets sold, that figure, equity in jobs, would probably not be an asset of the company?
A. At that particular time, if all of the cash had been received and all of the expenses had been paid and there was five hundred sixty-nine thousand dollars difference between that that was spent and that that was paid, then that would be a loss. Yes. If it happened to be that the cash was more, then it would be a profit.
Now, this is a total of all of the jobs that were in process at that time. It is broken down job by job.
Q. Okay. What I am trying to determine is that if you were to liquidate the company on June 30 of 1979, the figure for equity in jobs, that would not be an asset, as such? I mean, you would not be able to reduce that to—
A. In order to determine it, you would have to record your income, you know, your amount that you had received or that you were going to receive, and then when you finally got that matching process done, that's correct, whatever that happened to be would reflect whether it was a profit or a loss.
Q. It would reflect whether it was a profit or loss, but as to whether it is an asset at the present time, it would not be a liquidable asset as of June 30 of 1979?
A. It would just reflect the amount that was spent in excess of the amount of income that they had received.
Q. So, the figure in the assets column, it is not an asset you could lay your hands on or an asset you could go to the bank and take out or an asset you could sell, it was more or less an asset which is just a bookkeeping figure?

A. Yeah, it was not—You wouldn't be able to determine from this, the way this internal statement was, whether that was going to be a profit or a loss. So, therefore, if you went to a bank and said, I have work in process of five hundred sixty-nine thousand, they would say, well, how much money are you going to receive in connection with that work in process. And if you could show them that you were going to receive a million five hundred sixty-nine thousand, then that would be a good thing. But if you were only going to receive a hundred thousand dollars, then they would know that four hundred sixty-nine thousand would be a loss.
Q. So, this equity in jobs could also be labeled work in progress or expected receipts from continued operation or continuation of a job?
A. Hopefully, it would be expected receipts if it was going to be a profit.

Exhibit L (Nolan Deposition) 34–37.

Linden, the certified public accountant who was called as a witness for the defendants, described "equity in jobs" as

normally the cost you've accumulated, which includes a direct job cost, overhead cost, an allocation of overhead—and this could be uncompleted jobs—in excess of the billings on those jobs.

5 Trial Transcript 18. At the conclusion of the cross-examination of the certified public accountant, the court initiated with the witness the colloquy that follows:

THE COURT: Let me understand about the equity in jobs. If you only had one job and you had allocated to the equity-in-jobs account whatever is the corporate amount of overhead—I guess you had one job that you allocated all of your overhead?
THE WITNESS: Well, there'd be certain things maybe, like our secretarial cost or something like that.
THE COURT: Then you'd allocate all the direct costs that you had, then, on a particular job?
THE WITNESS: Yes.

THE COURT: And then you would take from that whatever payments had been made on the job; is that correct?

THE WITNESS: Yes, the billings, it's called. The terminology is billings to date.

THE COURT: So if you then had a figure, say, $100,000, where the cost had exceeded income that had been received on the job, if you end up losing money on that job then that would not be an asset? That would be a zero—

THE WITNESS: When the job was ultimately closed, if you lose money, then it clears out and goes through your income statement, and then it would be a loss as it goes through the income statement.

THE COURT: So the fact that you have a hundred thousand dollar figure as equity in a job is really not meaningful until you actually complete the job?

THE WITNESS: Well, it is, because you have a contract sitting out there for a total amount. It's based on you have an X number of dollars for the contract, and then you have costs in that contract. So you have to relate the two together. Think of it as a manufacturing company. They have work in process of inventory in process, and it's sitting there in their inventory until they complete it. Then they sell it, and they recognize a dollar for it, and they take it out of their inventory, and then it goes into cost of sales then.

THE COURT: To get back to the hundred thousand dollars, if you end up losing $20,000 of that job, that means that was an $80,000 asset; is that correct? You're carrying it at $100,000 at a particular point in time, and you finally work all the way through the contract.

THE WITNESS: Right.

THE COURT: And you've lost $20,000. That means, I assume, that your costs have exceeded the total revenue by $20,000?

THE WITNESS: Right.

THE COURT: When you had the [$]100,000, you had contemplated receiving [$]100,000 in revenue to offset those costs, which you never received?

THE WITNESS: Yes.

THE COURT: So that meant that that $100,000 asset would end up being an $80,000 asset? If you lost $100,000 on the job, then the [$]100,000 went to zero?

THE WITNESS: Well, I don't think the [$]100,000 goes down. The way you look at [it] is you have, say if the contract was [$]100,000—

THE COURT: You had equity in the job at a particular point in time of $100,000.

THE WITNESS: Okay.

THE COURT: That's costs that you expect to recover from the payments on the job?

THE WITNESS: Right, okay.

THE COURT: And if you eventually don't get enough payments to cover all your costs, then that $100,000 plus at that point in time may end up being, say, if you lost $20,000 on the job, an $80,000 plus?

THE WITNESS: Right. All the accounts receivable that you don't collect, you lose it, that's right.

THE COURT: And if you lost $100,000 on the job, then the $100,000 goes to zero?

WITNESS: Yes.

5 Trial Transcript 26–29.

Nolan testified in the following manner concerning the liquidity of "equity in jobs":

Q. If the company were liquidated as of the date of any one of these balance sheets, that equity in progress would not be a liquidable asset, isn't that correct?

A. You can't tell from this financial statement whether that would be true or not. You don't have a full financial statement here. You have half of a financial statement. You only have a balance sheet.

You have to have the income statement. You have to have the job cost schedules in order to see whether—and also, you have to know whether there's going to be profit in that job or not. So you can't say, from looking at this financial statement, whether that would be an asset, or whether it would not be an

asset. It appears to be an asset on this financial statement, but you can't—

Q. You're saying you can't tell, but it's listed as an asset, isn't that correct?

A. It is listed as an asset. If it were accurate, sir, it would be an asset.

Q. Could, if I owned that asset that's listed there in that asset column, and I had a sale here at the corner of Eighth and Broadway, could I sell that asset?

A. If you could go on and bill the customers that you had gotten the jobs from for additional income, then that would turn that over. And yes, sir, that would be an asset that you could sell.

Q. But you would have to be able to continue performing under the contract and finish the job for that asset to have any value?

. . . . .

. . . for that asset to be able to be liquidated, you basically had to have funds to finish the job or would have to be able to finish the job, is that correct?

A. From looking at this financial statement, I can't say that's correct or not correct.

3 Trial Transcript 204–05.

Both Nolan and Linden testified that, at best, the "equity in jobs" figure was an estimate of the accumulated costs (direct job costs, overhead costs, and allocation–of–overhead costs) in excess of the billings to date on those jobs and that the figure did not represent the gain or loss resulting from the jobs. Linden testified that "you'd have to look at the jobs" to determine whether the figure accurately reflected an asset at any given point in time prior to completion of the job contracts. 5 Trial Transcript 25.

The debtor was without any jobs during 1978. Exhibit L (Nolan Deposition) 40–41. The debtor's only income for the year 1978 was from the periodic rental of equipment. *Id.* The debtor's average monthly overhead during 1978 was $35,000. *Id.* at 40. Beginning in January 1979, the debtor's monthly overhead increased to $50,000. *Id.* at 41. In May or June of 1979 the debtor was awarded four job contracts. 3 Trial Transcript 219. To finance these contracts, the shareholder obtained a $400,000 loan from United American Bank in Knoxville, Tennessee, and an additional $200,000 loan from Liberty National Bank in Louisville, Kentucky, secured by a certificate of deposit owned by Ranier's mother. 3 Trial Transcript 221–23; Exhibit L (Nolan Deposition) 44, 46. The debtor itself was unable to obtain any financing because of its dismal earnings for the prior year. 3 Trial Transcript 221. Even the financing that the shareholder obtained for the debtor soon proved insufficient to meet the debtor's job costs. Nolan testified that from the time the debtor was awarded the four contracts in May or June of 1979, the debtor was always "hurting for money." Exhibit L (Nolan Deposition) 46. It was this situation, in fact, that necessitated most of the transactions herein at issue. The shareholder deposited its own funds into the debtor's payroll account, for instance, to ensure completion of the jobs in progress. *See* 4 Trial Transcript 359–60. The shareholder also deposited its own funds into the debtor's general account to cover overdrafts for trade payables. 4 Trial Transcript 363. Payments on the debtor's billings on the four jobs uniformly were delinquent, and, as a result, the debtor's bank accounts uniformly were in an overdraft status. Each of the four job contracts resulted in a loss to the debtor. The posting of invoices in November of 1979 that increased the debtor's accounts payable by approximately $605,000 was not the first indication that a loss would be sustained, but rather only demonstrated, according to Nolan, that the loss was to be much larger than had been anticipated. 3 Trial Transcript 225; Exhibit L (Nolan Deposition) 47–49.

The facts before the court in this proceeding are similar to those before the First Circuit Court of Appeals in *Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573 (1st Cir. 1980). In *Constructora Maza*, the debtor in possession was engaged in the construction of single–and multi–unit residential structures. To secure certain of its indebtedness, the debtor in possession with-

in four months of its filing had assigned to a bank all of the retainages and progress billings due on its outstanding construction projects, certificates of deposit, and certain promissory notes that it held as obligee. In determining whether the debtor in possession was insolvent at the time of these transfers for the purpose of § 60(b) of the old Act, both the trial court and the appellate court considered a financial statement that the debtor in possession had prepared using the percentage–of–completion method of accounting. The financial statement purported to show the debtor's financial condition as of June 30, 1975, and included as an asset an entry for retainages on outstanding construction contracts. The debtor in possession's former executive vice–president testified that nearly the entire figure represented progress billings that were uncollectible due to defects in construction, a lack of funds with which to complete the project, and the debtor's inability to obtain any new contracts in the nine months subsequent to the preparation of the financial statement. The trial court refused to consider these sums as assets in the preference context and concluded from the resulting deficit in liabilities over assets that the debtor had been insolvent at the time of the transfers. The First Circuit affirmed. 616 F.2d at 573, 577–78.

"Equity in jobs" as a term referring merely to a corporation's investment in uncompleted jobs is meaningless. "Equity in jobs" as a term referring to accrued profit (earnings less costs) that has not yet been collected would properly be classified as an asset for balance–sheet purposes, especially if the debtor could show that parallel figures for actual costs were less than or equal to figures for projected costs. In a bankruptcy proceeding to determine whether preferential transfers have been made, however, the court must assess the value of a debtor's "equity in jobs" not strictly in accounting terms, but in terms of the fair market price that a willing purchaser would have offered for the same at the time that the alleged preference occurred. In this proceeding, the court is of the view that the attitude of such a purchaser would have

been analogous to that taken by the banks and other institutions that declined to advance funds directly to the debtor during the summer of 1979. The court finds that, based upon the facts reviewed above, such a purchaser not only would have been unwilling to offer a price equal to the figures that appears on the balance sheet at the end of June 1979, but would have been unwilling to offer any price at all. From the resulting deficit in liabilities over the debtor's assets for the period ending June 30, 1979, the court concludes that the debtor in possession was insolvent for the purpose of § 547(b)(3) from the time that the shareholder because a creditor on June 5, 1979.

### Knowledge of Insolvency under § 547(b)(4)(B)

Section 547(b)(4)(B) provides that the trustee may avoid any transfer of the debtor's property made between 90 days and one year before the filing date if the creditor–transferee was an insider and had reasonable cause to believe the debtor was insolvent at the time of such transfer. Under § 101(25), an "insider" includes, if the debtor is a corporation, a director of the debtor, an officer of the debtor, and a person in control of the debtor. The shareholder was the debtor's sole shareholder at all times material hereto and was in complete control of the debtor. Both of the general partners were officers and directors of the debtor. The shareholder and its general partners were insiders for the purpose of § 547(b)(4)(B).

Under § 60(b) of the prior Act, actual knowledge of the debtor's insolvency or belief thereof was not necessary, only reasonable cause to believe. *Dougherty v. First Nat'l Bank*, 197 F. 241, 246 (6th Cir. 1912); *Dean v. Planters Nat'l Bank*, 176 F.Supp. 909, 913 (E.D.Ark.1959); 3 Collier, Bankruptcy ¶ 60.53[1] (14th ed. 1977). Factors that the courts considered in determining reasonable cause to believe the debtor to be insolvent included undercapitalization of the debtor, checks drawn on a bank account and payment refused by reason of insufficient funds, a consistent pattern of over-

drafts, and operating losses. *Dean v. Planters Nat'l Bank*, 176 F.Supp. 909, 914 (E.D. Ark.1959).

Nothing in the legislative history of § 547(b)(4)(B) indicates that the Congress intended to change the state of the law concerning reasonable cause to believe the debtor to be insolvent. One commentator has concluded that because the reasonable–cause requirement retained for transfers to insiders is virtually identical to that under prior law, much of the case law under the former provision will still apply under § 547(b)(4)(B). 4 Collier, Bankruptcy ¶ 547.30 (15th ed. 1980).

The court has little difficulty in concluding that the shareholder and its two general partners had reasonable cause to believe that the debtor was insolvent at all times subsequent to June 5, 1980. Nolan not only was aware of the debtor's financial condition but rigidly controlled all of its financial transactions. He was aware in June 1979 that the debtor was severely undercapitalized, and that its bank accounts remained uniformly in an overdraft status. As an accountant, he must be charged with knowledge that the "equity in jobs" included on the debtor's balance sheet was not a viable asset for insolvency definition purposes.

### Percentage of Creditor's Claim under § 547(b)(5)

■ Section 547(b)(5) requires a comparison between what the creditor actually received and what the creditor would have received in a chapter 7 liquidation but for the transfer. 4 Collier, Bankruptcy § 547.35 (15th ed. 1980). The court must focus upon the relative distribution between classes as well as the amount that will be received by the members of the class of which the transferee is a member. S.Rep. No.95–989, 95th Cong., 2d Sess. 87 (1978); H.R.Rep.No.95–595, 95th Cong., 1st Sess. 372 (1977). The test under § 547(b)(5) is whether the creditor obtained from the debtor's property a greater percentage of his debt than some other creditor would have received under the distributive provi-

sions of the Code had the transfer not occurred. 4 Collier, Bankruptcy ¶ 547.35 (15th ed. 1980). Whether a creditor had received a preference under the prior Act was determined not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the *actual effect* of the payment as determined when bankruptcy results. *Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 229, 56 S.Ct. 450, 451, 80 L.Ed. 655, 657 (1936); *Baranow v. Gibraltar Factors Corp. (In re Hygrade Envelope Corp.)*, 393 F.2d 60, 64 (2d Cir.), *cert. denied*, 393 U.S. 837, 89 S.Ct. 114, 21 L.Ed.2d 108 (1968).

Although the Code does not define "class," the cases under the prior Act agreed that

[c]reditors who, in the absence of preferences, are entitled to receive the same percentage upon their claims out of the estate of the bankrupt, are members of the same class. Those who are entitled to different percentages are of different classes.

*Swarts v. Fourth Nat'l Bank*, 117 F. 1, 8 (8th Cir. 1902). Holders of secured claims constitute one class, holders of priority claims under § 507 are in separate classes, and general unsecured creditors are in still another class. 4 Collier, Bankruptcy ¶ 547.35 (15th ed. 1980).

The shareholder is an unsecured creditor. The trustee demonstrated at trial that, after adding the total amount of the transfers herein at issue to the debtor's total assets, subtracting the total of all priority claims, and dividing the total assets by the total unsecured debt (including that owed to shareholder), unsecured creditors would receive .775054 percent of their indebtedness. The trustee then attempted to show that, because of the transfers, the shareholder actually received .885750 percent of its indebtedness.

Although not challenging the accuracy of the trustee's computations, the shareholder asserts that § 547(b)(5) requires a determination that the net effect of all of the

transactions between itself and the debtor was to deplete the debtor's estate and thus to interfere with the otherwise equal distribution of the debtor's assets among the debtor's creditors. The shareholder asserts that when otherwise preferential transfers are followed by extensions of credit that result in a net increase in the debtor's estate to the benefit of all of the debtor's creditors, such transfers are not voidable preferential transfers as defined by § 547(b)(5). The defendants, in short, urge the court in its interpretation of § 547(b)(5) to adopt the "net result" rule that was applicable under § 60(a) of the prior Act.

The cases under the Act indicate that the "net result" rule that the courts applied under § 60(a) and the setoff provision of § 60(c) both arose from the close interaction between the changing provisions of § 57(g) and the first three subsections of ·§ 60.

As originally enacted, § 57(g) of the Act provided that "[t]he claims of creditors who have received preferences shall not be allowed unless such creditors shall surrender their preferences." Act of July 1, 1898, ch. 541, § 57(g), 30 Stat. 544. Section 60(a) of the Act defined a preference as a transfer by the debtor while insolvent to any one of his creditors that would enable that creditor to obtain a greater percentage of his debt than any other of such creditors of the same class. *Id.* § 60(a). Section 60(b) of the Act permitted the trustee to avoid a preference upon a showing that the transferee had reasonable cause to believe that the transfer had been intended as a preference. *Id.* § 60(b). Because the debtor's insolvency was an essential element in the definition of a preference under § 60(a), knowledge or a reasonable cause to believe that the transfer had been intended as a preference under the Act ordinarily required knowledge or reasonable· cause to believe that the debtor was insolvent.[3] 3 Collier, Bankruptcy ¶ 60.-52[1] (14th ed. 1977). Section 60(c) of the Act provided:

If a creditor has been preferred, and afterwards in good faith gives the debtor further credit without security of any kind for property which becomes a part of the debtor's estates, the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy may be set off against the amount which would otherwise be recoverable from him. Act of July 1, 1898, *supra*, § 60(c).

In *McKey v. Lee*, 105 F. 923 (7th Cir. 1901), the debtor had made payments within four months of the filing of his petition in bankruptcy to a creditor who had no knowledge of the debtor's insolvency. The payments were made for goods and merchandise purchased during the same four–month period. Evidently presuming that the payments were preferences as defined by § 60(a), the Seventh Circuit Court of Appeals held that, because the sale of goods to the debtor after the payments had amounted to further credit extended to the debtor in good faith and without security within the purview of § 60(c), the creditor was entitled to set off the value of such goods against the payments and that § 57(g) required as a condition to the allowance of a claim only the return of the surplus. 105 F. at 925–26. A similar result was reached by the United States District Court for the Southern District of Ohio in *In re John Morrow & Co.*, 134 F. 686, 688 (S.D.Ohio 1901).

Subsequent to *McKey*, the United States Supreme Court in *Pirie v. Chicago Title & Trust Co.*, 182 U.S. 438, 21 S.Ct. 906, 45 L.Ed. 1171 (1901), held that the trustee may not avoid a preference consisting of payments made within four months of the filing for goods and merchandise purchased on account during the same period of time when the transferee had no reasonable cause to believe that the debtor was insolvent and thus had no reasonable cause to believe that the transfer had been intended as a preference. The Court also held in *Pirie*, however, that § 57(g) of the Act

---

**3.** The 1938 Act for the first time required a showing that the transferee had reasonable cause to believe that the debtor was insolvent at the time of the transfer. 3 Collier, Bankruptcy ¶ 60.06[1] (14th ed. 1977).

required the surrender of even a non–voidable preference as a prerequisite to the proof of any claim in bankruptcy. 182 U.S. at 447–55, 21 S.Ct. at 909–10.

Lower courts immediately attempted to avoid the harsh result reached in *Pirie*. In *Dickson v. Wyman*, 111 F. 726 (1st Cir. 1901, which was decided less than six months later and which arose from facts similar to those in *McKey*, the First Circuit chose to avoid the effect of § 57(g) as interpreted by *Pirie* not by applying § 60(c), but by finding that such payments, when considered together with subsequent purchases on a running account, are not preferences as defined in § 60(a):

> While the supreme court has adopted a liberal construction of the statute in question, and we are bound to follow it, there must nevertheless be a limit to that method of interpretation .... It is beyond all reason to hold, because a creditor has, in the ordinary course of business, during the four months preceding bankruptcy, received payments which under some circumstances might operate as a preference in some views of the law, that that fact can be held to bar the proof of his claim, when, looking at all the transactions together, they demonstrate not only that they were without any intention to acquire any unjust preference, but also that they have increased the net indebtedness to the creditor, and correspondingly increased the bankrupt's estate. In order to avoid so unreasonable a result, we might say that all the transactions covered by the account current should be regarded as one, so that it could not be held that the effect of the payments was to enable the creditors at bar to obtain a greater percentage of their debt than any other creditor of the same class, within the meaning of paragraph "a" of section 60. A result was reached under similar circumstances by the circuit court of appeals for the Seventh Circuit in *McKey v. Lee*, 45 C.C.A. 127, 105 Fed. 923 ... by giving a construction to paragraph "c" of section 60 beyond what its letter calls for; but we prefer to put the result on the broad ground that in the

absence of positive and direct expressions, evidently intended to accomplish a particular purpose, the ordinary rules of construction require us to avoid interpreting this statute so as to effectuate so unreasonable a purpose.

111 F. at 728–29. A similar result was reached by the Eighth Circuit in *Kimball v. E. A. Rosenham Co.*, 114 F. 85 (8th Cir. 1902), which held that

> the receipt by a creditor of payments upon an account current, in the usual course of business, which are followed by new credits for property delivered to the debtor, which becomes a part of his estate, for which the creditor has not been paid, and which equals or exceeds in amount and value the payments, does not constitute a preference, under section 60a, and does not require the creditor to surrender such payments as a condition of the allowance of his claim, under section 57g of the bankrupt act of 1898.

114 F. at 88–89. In *Gans v. Ellison*, 114 F. 734 (3d Cir. 1902), the Third Circuit held that nothing in *Pirie* prevented a creditor who had no knowledge of the debtor's insolvency from applying the setoff provided for in § 60(c) for the purpose of satisfying the requirement of § 57(g). 114 F. at 736. The *Gans* court, however, adopted in the alternative the view taken by the First Circuit in *Dickson* :

> Upon the true interpretation of paragraph "a" of section 60, the preference in such case as this is the net gain to the creditor upon the transactions between him and the debtor. The net balance in favor of the creditor is the real preference under the law. For only to the extent of such net gain does the creditor "obtain a greater percentage of his debt than any other creditors of the same class." And so, on the other hand, only to the amount of the net gain to the creditor is the estate of the debtor impaired. If, then, a creditor innocently preferred has given return credits afterwards, he has surrendered his preference to the extent of such return credits. To effectuate justice, both sides of the account are to be

considered in the case of a creditor who innocently has received preferences, and afterwards in good faith has given the debtor further credit, without security, for property which has become a part of the debtor's estate. Otherwise it is plain that such innocently preferred creditor would be compelled to surrender his preference a second time before he could prove his claim against the bankrupt's estate.

114 F. at 737. The court in *Gans* appeared to be concerned that any other interpretation would allow § 57(g) to accomplish the same result as § 60(b) even though the creditor had no knowledge of or reasonable cause to believe the debtor to have been insolvent:

It is hard to believe that it was the intention of congress to put a creditor who had innocently taken a preference in a worse plight than a creditor who had knowingly done so. But to that conclusion we are asked to come. The appellant's argument runs thus: That although if the appellees had acted with guilty knowledge, their claims as allowed would stand; yet, having taken a preference ignorantly and in good faith, they cannot have the benefit of their subsequent credits which augmented the bankrupts' estate. Certainly a construction leading to a result so unreasonable is not to be adopted unless it is unavoidable by reason of the language employed by the lawmakers.

114 F. at 736. Relying upon the decisions in *Dickson, Kimball*, and *Gans*, the Second Circuit in *In re Sagor & Brother*, 9 Am.Bankr. Rep. 361 (2d Cir. 1903), likewise concluded that payments and sales under a running account in which new sales occur subsequent to the debtor's payments and in which the net result is to increase the debtor's indebtedness to the transferee do not constitute preferential transfers under § 60(a). The *Sagor* court agreed with the court in *Gans* that only when the net result of such transactions is a balance in favor of the transferee does the creditor "obtain a greater percentage of his debt than any other creditors of the same class" as required by § 60(a). 9 Am.Bankr.Rep. at 367–68.

In *Jaquith v. Alden*, 189 U.S. 78, 23 S.Ct. 649, 47 L.Ed. 717 (1903), the United States Supreme Court followed the reasoning of the courts in *Dickson, Kimball, Gans*, and *Sagor* and held that payments on a running account, when new sales succeed payments and when the net result thereof is to increase the value of the debtor's estate, do not constitute preferential transfers under § 60(a). 189 U.S. at 83, 23 S.Ct. at 651. The Court's decision in *Jaquith* was reaffirmed in *Yaple v. Dahl–Millikan Grocery Co.*, 193 U.S. 526, 24 S.Ct. 552, 48 L.Ed. 776 (1904), and in *Joseph Wild & Co. v. Provident Life & Trust Co.*, 214 U.S. 292, 29 S.Ct. 619, 53 L.Ed. 1003 (1909). Although the transferees in each of these cases had in fact been unaware of the debtor's insolvency at the time of the transfers at issue, the Court did not premise its holdings upon a showing of lack of knowledge of insolvency.

Prior to the Court's decision in *Jaquith* and partly in response to the Court's earlier restrictive reading of § 57(g) in *Pirie*, the Congress in February 1903 amended § 57(g) to apply only to voidable preferences under § 60(b) and to certain other categories of transfers under § 67. Act of February 5, 1903, ch. 487, § 12, 32 Stat. 799. Arguably, therefore, the 1903 amendment of § 57(g) eliminated the theoretical foundation for the "net result" rule that the courts had developed in response to the decision in *Pirie*. Taylor, *Section 60c of the Bankruptcy Act: Inadequate Protection for the Running Account Creditor*, 24 Vand.L.Rev. 919, 923 (1971). The doctrine survived, however, and developed a life of its own independent of its original purpose. In 1908, in what appears to be the first decision after the 1903 amendment of § 57(g), the Sixth Circuit, in determining whether a transfer by a debtor–partner of substantially all of his property to his son constituted a preference of one creditor over another of the same class justifying an adjudication in bankruptcy upon a petition by a partnership creditor, held that an adjudication is not warranted when the debt preferred is an individual debt and not a partnership debt.

*Mills v. J. H. Fisher & Co.*, 159 F. 897, 900 (6th Cir. 1908). In reaching this conclusion, the court declared,

> A preference under section 60a of the bankrupt act is only such when it will enable any one of his creditors "to obtain a greater percentage of his debt than any other of such creditors of the same class." ... It is not a preference to make a payment upon a running account of purchases and payments, where the effect was not to diminish the fund to which the creditors look for payment. *Jaquith v. Alden*, 189 U.S. 78, 23 S.Ct. 649, 47 L.Ed. 717; *Yaple v. Dahl–Millikan Company*, 193 U.S. 526, 24 S.Ct. 552, 48 L.Ed. 776.

159 F. at 900.

In *Federal International Banking Co. v. Childs (In re Fred Stern & Co.)*, 54 F.2d 478 (2d Cir. 1931), the bankrupt corporation had made payments to a bank, which had no knowledge of the corporation's insolvency, under a revolving credit agreement during the year preceding the adjudication. The trustee asserted that § 57(g) as amended required that the bank return the payments as a prerequisite to sharing in the distribution of the estate. The court held that the payments were not preferential transfers as defined by § 60(a):

> It is unjust to hold that, because the appellee has in the ordinary course of business during the four months preceding bankruptcy received payments which, under similar circumstances, might operate as a preference in some views of the law, it will bar the proof of this claim when, looking at all the transactions together, they demonstrate they were with-out any intention to acquire or to give any unjust preferences, and particularly where they have increased the net indebtedness to the creditor and effected a corresponding increase of the bankrupt's estate. *In re Dickson*, 111 F. 726 (C.C.A. 1). In order to avoid such an unreasonable result, it is proper to hold that all the transactions covered by this account will be regarded as one, so that it may not be held that the effect of any of the payments was to enable the appellee to obtain a greater percentage of its debt than any other creditor of the same class, within the meaning of the Bankruptcy Act .... The test in determining the absence or existence of a preference is whether or not the entire course of dealings on the open account, resulting from this revolving credit, resulted in the enrichment of the insolvent estate.

54 F.2d at 480.[4]

Lack of knowledge of insolvency as an element of the "net result" rule appears first to have been required in *In re Farmers' Store & Supply Co.*, 214 F. 505 (N.D.W. Va.1914), in which two creditors with knowledge that the debtor company was "so involved in debt and bad management as to be unable to pay its debts, and therefore in the legal sense insolvent" attempted to put the debtor back on its feet by furnishing it on an open account with goods necessary to replenish its stock. The creditors within four months of the filing received payments from the debtor. The court concluded,

---

4. Concerning the "net result" rule as enunciated in *Jaquith, Yaple,* and *Wild,* Judge Learned Hand in a concurring opinion commented that "I am not sure that I understand on what principle those cases rest, but I cannot distinguish them on the facts." 54 F.2d at 481. In a dictum to a subsequent opinion interpreting not the Bankruptcy Act but the New York Stock Corporation Law, Hand observed,

> [I]t is true that a times when the debtor and the creditor have had a running merchandise account, begun after the debtor is insolvent, and ending in an enrichment of the estate, payments made upon the account are not treated as preferences. *Jaquith v. Alden*, 189

U.S. 78, 23 S.Ct. 649, 47 L.Ed. 717; *Yaple v. Dahl–Millikan Grocery Co.*, 193 U.S. 526, 24 S.Ct. 552, 48 L.Ed. 776; *Wild v. Provident Trust Co.*, 214 U.S. 292, 29 S.Ct. 619, 53 L.Ed. 1003; *In re Fred Stern & Co.*, 54 F.(2d) 478 (C.C.A.2). The doctrine is somewhat anomalous at best, and can be defended in principle only by the fiction of treating all items of the account as one and the payment as therefore subject to a set–off of the dividends payable on all. Even that will not serve unless the dividends exhaust the preference.

*Willcox v. Goess*, 92 F.2d 8, 12 (2d Cir. 1937), *cert. denied*, 303 U.S. 647, 58 S.Ct. 646, 82 L.Ed. 1108 (1938).

It is clear ... that merchants may sell goods to an insolvent customer, and may receive payments from him on account thereof within the four months prior to adjudication in bankruptcy, without such payments constituting a preference, provided the creditor so selling has no knowledge of the insolvency of his customer. If he has such knowledge, then such payments become preferential.

214 F. at 506. In *In re Grocers' Baking Co.*, 266 F. 900 (M.D. & N.D.Ala.1920), *aff'd sub nom. Eggleston v. Birmingham Trust & Savings Co.*, 277 F. 1015 (5th Cir. 1921), the debtor executed promissory notes and mortgages to one of its creditors within four months of the filing in part as payment on a running account for supplies furnished for the purpose of allowing the debtor to remain in business. The court, in concluding that the transfers did not constitute voidable preferences under § 60(a), seemed to premise its holding upon a finding that the creditor had been unaware of the debtor's insolvency at the time of the transfers:

[The creditor] believed, and had apparent good reason to believe, that the concern would be tided over a temporary embarrassment, and would, by the advancement made ... be able to continue business and preserve the estate. [The creditor] subtracted nothing from the assets of the estate when [it] took the papers from the baking company. On the contrary, [it] added to the estate, by furnishing flour, lard, etc., for its operation, in harmony with the major purpose of making the notes and mortgages. To constitute a preferential transfer within the meaning of the Bankruptcy Act, there must be a parting with the bankrupt's property for the benefit of the creditor and a consequent diminution of the bankrupt's estate.

It may be true that there was included in these conveyances a large amount of the property of the bankrupt, but the transaction was in good faith, with a view of preserving the estate and enabling it to continue as a going concern and to meet its indebtedness. Such conveyances were valid at common law ... and,

while Congress in the Bankruptcy Act strikes down preferential conveyances, where the party has good reason to believe that a preference is intended, Congress has not declared voidable merely preferential conveyances made in good faith, if the grantee, as in the present case, was ignorant of the insolvency of the grantor and had no reason to believe that a preference was intended. ... Payments on a running account, where new sales succeed payments, and the net result is to increase the value of the estate, do not constitute preferential transfers under section 60a.

266 F. at 909–10 (citations omitted).

Ignorance of insolvency was not required in *Wilson v. Kanter (In re Marley–Morse Co.)*, 275 F. 832 (7th Cir. 1921). In *Marley–Morse* the debtor was in the mail-order grocery business. After the debtor had failed to fill orders for several months, the debtor's ten largest creditors entered into an agreement with the debtor for an extension of their claims and for the appointment of a creditors committee to supervise the operation of the business. After entering into the agreement, the debtor continued to purchase goods from one of the creditors on a running account. The debtor made periodic payments to the creditor, and the creditor made subsequent sales to the debtor throughout the four months preceding the filing. The court, without making any finding as to the debtor's insolvency or to the creditor's knowledge thereof, concluded:

[T]he record ... discloses that the balance due the [creditor's] firm when the contract was made, instead of being reduced, became considerably increased. The record fairly warrants the conclusion that, in thus supplying merchandise after the creditors' agreement was made, it was upon the faith, not only that the concern would thus be saved from bankruptcy, but that such merchandise should not, upon being supplied, at once go to enhance the estate for the benefit of other creditors, but that, out of the proceeds of sales in due course of business, the merchandise thus supplied would be paid

for. Such payments, under the indicated facts, are not preferential within the meaning of the law, and do not interfere with the allowance as a general claim of the entire debt, exceeding as it does the indebtedness to this creditor at the time the agreement was made.

275 F. at 833–34 (citations omitted).

Lack of knowledge of insolvency was required by the Third Circuit in *Campanella v. Liebowitz (In re Peter Cassinelli Macaroni Co.)*, 103 F.2d 252 (3d Cir. 1939). The creditor in the month preceding the filing delivered a carload of flour to the debtor in return for a thirty–day note. The debtor paid the note by a certified check within days of the filing. Without any discussion of the earlier courts' holdings that payments upon a running account when the net effect was to increase the debtor's estate did not constitute preferential transfers because they did not enable the transferee to obtain a greater percentage of his debt than some other creditor of the same class, the court in *Campanella* reasoned that nothing in the earlier decisions indicated that the protection initially intended by the doctrine for innocent transferees was to be extended to creditors on running accounts who had reasonable cause to believe that they were being preferred at the time the payments were made. 103 F.2d at 253. The court concluded that "*any* payment, received within four months of bankruptcy by a creditor who has reasonable cause to believe that the debtor–payor is insolvent, is a voidable preference and may be recovered by the trustee" under § 60(b). 103 F.2d at 254 (emphasis supplied). A similar requirement was imposed by the Fifth Circuit in *Cooper Petroleum Co. v. Hart*, 379 F.2d 777 (5th Cir. 1967). On the first day of the four-month period preceding the filing of the bankruptcy petition, the debtor owed Cooper Petroleum $34,599.83 for goods delivered on an open account. During the ensuing four months, Cooper Petroleum continued to deliver goods to the bankrupt on the account in the amount of $45,000. During the same four months, the debtor made payments on the account in the amount of $74,754.78. The District Court concluded

that $34,599.83 of the $74,754.78 represented a voidable preference recoverable by the trustee. The Fifth Circuit reversed to the extent that the District Court had failed to find the remaining $40,154.94 to constitute a voidable preference. Rejecting the District Court's application of the "net result" rule when the creditor had knowledge of the bankrupt's insolvency, the court in *Cooper Petroleum* reasoned that

the Supreme Court decisions in which the rule arose as well as subsequent cases relying upon those decisions appear to have placed much more emphasis upon the creditor's lack of knowledge of the debtor's insolvency to justify application of the rule than upon any rationalization as to enrichment of the debtor's estate.... Indeed, several courts have persuasively indicated that where, as here, the creditor accepting payments on open account is found to have had reason to believe the debtor to be insolvent the rule is simply inapplicable, and *all* such payments, having been made in satisfaction of an antecedent debt, should be properly regarded as voidable preferences.

379 F.2d at 780–81.

The decisions from two other circuits are to the contrary. In *In re Stewart*, 233 F.Supp. 89 (D.Or.1964), a creditor within four months of the filing who was owed for gasoline already delivered to the debtor's station agreed to continue making deliveries if payments were made concurrently with each delivery. Each payment was to be applied to retire the oldest portion of the debt. The referee in bankruptcy held that the payments were voidable preferences. The District Court reversed and held that payments on a running account within the four–month period when new sales succeed payments and the net result is to increase the value of the estate do not constitute preferential transfers within the meaning of § 60(a). The court observed that to hold otherwise

would create chaos in that vast area of business relationships where the creditor has knowledge of the debtor's difficulty,

but desires to assist in solving the problems by going along with the debtor on an arrangement similar to [the one presented here] .... [A] plan such as that, time after time, assists the debtor in putting his house in order, paying all creditors and making a success of his own venture. To treat such a transaction as a preference within the meaning of the bankruptcy act would be nothing short of placing a premium, or a brand of approval, on the actions of those creditors who do not attempt to assist the debtor, but on the other hand attach the property and thus force the debtor out of business.

233 F.Supp. at 92. In holding that such payments do not constitute voidable preferences, the court acknowledged that several of the early decisions were premised on a lack of knowledge of the bankrupt's insolvency at the time the credit was extended, but expressly declined to follow the holding in *Campanella*. 233 F.Supp. at 92–93.

Consistent with *Stewart*, the Eighth Circuit in *Farmers Bank v. Julian*, 383 F.2d 314 (8th Cir.), *cert. denied*, 389 U.S. 1021, 88 S.Ct. 593, 19 L.Ed.2d 662 (1967), applied the "net result" rule, not to a running account, but to the substantial repayment of a bank loan within four months of bankruptcy that in turn precipitated a subsequent loan to the debtor. Within four months of the filing, the debtor repaid all but $3,000 of a $12,000 loan. This substantial repayment of the loan precipitated a subsequent loan of $16,000. The debtor received $13,000 in cash, of which sum $3,000 was applied to retire the balance owed on the previous loan. The court held that the repayment of the $12,000 loan was not a voidable preference under § 60(a):

> When a creditor in good faith enriches a debtor's estate and this enrichment was caused by the otherwise preferential payment of an outstanding debt, the other creditors are only treated inequally to the extent that the preferential payments exceeded the new advances. If the new credit equals or exceeds the amount of the otherwise preferential payment the other creditors have not been harmed. Consequently, there is no recognizable

preference under the equitable principles of § 60(a). How can it be said that one creditor is preferred over the others when immediately upon payment of a $12,-000.00 loan the creditor gives the debtor an additional $16,000.00 in credits and assets? The net result of such a transaction is to enrich the estate of the bankrupt a total of $4,000.00.

> ... Viewing the transaction as a whole ... not only are the other creditors actually benefited, but the Bank received no greater share of the bankrupt's assets than it would had the bankrupt failed to satisfy the May loan.

As these transactions do not interfere with an equal distribution of the bankrupt's assets among creditors of appellant's class, we believe the repayment of the $12,000.00 May loan did not result in a preference to the Bank as it precipitated new assets flowing to the bankrupt in excess of the amount of the payments.

383 F.2d at 328 (citations omitted).

The cases thus indicate that the "net result" rule under § 60(a) developed as a doctrine separate and apart from the setoff provision of § 60(c) of the Act. In order for § 60(c) to apply, there must have been a preferential transfer that was recoverable by the trustee. *See Baranow v. Gibraltar Factors Corp. (In re Hygrade Envelope Corp.)*, 393 F.2d 60, 65–67 (2d Cir.), *cert. denied*, 393 U.S. 837, 89 S.Ct. 114, 21 L.Ed.2d 108 (1968); *Wertz v. Nat'l City Bank*, 115 F.2d 65, 68 (7th Cir. 1940). The justification for the right to set off new credit against previous preferences under § 60(c) was the enrichment of the debtor's estate by the new assets added to it since the time of the prior preferential depletion. *Atlas v. Eastern Yarn Mills, Inc.*, 27 F.Supp. 478, 479 (E.D.N.Y.1939). The justification for the "net result" rule under § 60(a), at least since 1903, was that payments upon a running account in which there were post–payment sales or extensions of credit did not constitute preferential transfers at all, because the transactions taken as a whole did not enable the transferee to obtain a greater percentage of his debt than some

other creditor of the same class. *Farmers Bank v. Julian*, 383 F.2d 314, 328 (8th Cir.), *cert. denied*, 389 U.S. 1021, 88 S.Ct. 593, 19 L.Ed.2d 662 (1967).

The legislative history of § 547(c)(1) indicates that this exception was intended to codify "the net result rule in section 60c of current law." S.Rep.No.95–989, 95th Cong., 2d Sess. 88 (1978), U.S.Code Cong. & Admin.News 1978, p. 5874; H.R.Rep.No.95–595, 95th Cong., 1st Sess. 374 (1977), U.S. Code Cong. & Admin.News 1978, p. 6330. There is no indication that the Congress intended to effect any change in the separate "net result" rule that the courts had developed under the definitional provisions of § 60(a) of the prior Act. The latter "net result" rule, therefore, will continue to apply under § 547(b)(5). Although § 547(b)(5) modifies the old greater–percentage test under § 60(a) to the extent that the court now must focus on the relative distribution between classes as well as the amount that will be received by the members of the class of which the transferee is a member, section 547(b)(5)(B) specifically requires a showing that the transfer enable the creditor to receive more than such creditor would receive if the transfer had not been made. Accepting the debtor's assets at face value, the trustee's computations might very well accurately reflect that the defendants would have received a lesser percentage of their debt than would have been the case had the assets represented by the payments remained a part of the debtor's estate. This analysis neglects to consider, however, that the debtor's estate was increased to the extent that the extensions of credit by the shareholder exceeded the payments made by the debtor and that to this

extent all of the debtor's creditors benefited from the transactions' having occurred.

The decisions have been confused and inconsistent on the issue of whether lack of knowledge of insolvency was a prerequisite to application of the "net result" rule under § 60(a). Ignorance of insolvency unquestionably was a factor in the origin of the rule as an equitable response to the harsh application of § 57(g) of the Act in *Pirie*. The rule, however, survived the 1903 remedial amendment of § 57(g) as an independent doctrine under the greater–percentage test of § 60(a). To have required an ignorance of insolvency as a prerequisite to application of the rule, therefore, would have been internally inconsistent with the other definitional elements of § 60(a) and, as a result, soon would have rendered the rule meaningless. Such a requirement likewise would be contrary to the definitional elements of § 547(b), which, except with respect to insiders, requires no showing that the transferee had reasonable cause to believe the debtor to have been insolvent at the time of the transfer. With respect to insiders, such a requirement would render § 547(b)(5) incompatible with § 547(b)(4)(B)(ii) and thus for all practical purposes would eliminate the "net result" rule under § 547(b)(5) as applicable to insiders. Finally, such a requirement would be inconsistent with the fundamental purpose for the voidable preference provisions of the Code, which is not the imposition of a penalty upon creditors preferred by the debtor, but the equitable distribution of the debtor's assets among all creditors.

It is the court's opinion, therefore, that the transfers herein at issue do not constitute preferential transfers.[5]

---

**5.** This disposition eliminates the necessity for considering the defendants' reliance upon the exceptions provided for by § 547(c)(1) and § 547(c)(2), neither of which in any event appears to be available to the defendants.

In connection with the antecedent–debt requirement of § 60(b), the courts uniformly held that a preference implies a paying or the securing of a pre–existing debt of the person preferred and does not extend to a transfer or to the giving of security for a substantially contemporaneous giving of new value. *Dean v.*

*Davis*, 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419 (1917); *Harper v. First Nat'l Bank*, 169 F.Supp. 321 (W.D.La.1957); *Robertson v. Hennochsberg*, 1 F.2d 604 (W.D.Tenn.1924); 3 Collier Bankruptcy ¶ 60.19 (14th ed. 1977). Section 547(c)(1) provides that the trustee may not avoid a transfer otherwise determined to be a preference to the extent that the transfer was intended as and in fact was a substantially contemporaneous exchange for new value given to the debtor. Section 547(c)(1) adopts as an exception the well–established rule first

enunciated in *Dean v. Davis, supra.* 4 Collier, Bankruptcy ' 547.37[2] (15th ed. 1980); Countryman, *Bankruptcy Preferences–Current Law and Proposed Changes*, 11 U.C.C.L.J. 95, 102 (1978).

In the light of the court's finding that each of the transfers herein at issue was for or on account of an antecedent debt owed by the debtor, the court likewise concludes that none of the transfers were substantially contemporaneous exchanges for new value.

Section 547(c)(2) provides for an exception to the trustee's avoiding power when a transfer was in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the creditor if the payment was made within forty–five days of the time of the debt was incurred, was made in the ordinary course of business or financial affairs of the debtor and the creditor, and was made according to ordinary business terms. The phrase

"financial affairs" was included in § 547(c)(2) to ensure that consumer debts were brought within the purview of the exception. S.Rep. No.95–989, 95th Cong., 2d Sess. 88 (1978); H.R.Rep.No.95–595, 95th Cong., 1st Sess. 37 (1977); 4 Collier, Bankruptcy ' 547.38 (15th ed. 1980). Section 547(c)(2) insulates ordinary trade credit transactions that are kept current. *Weill v. Southern Credit Union (In re Bowen)*, 3 B.R. 617, 619 (Bkrtcy.E.D.Tenn.1980); Levin, *An Introduction to the Trustee's Avoiding Powers*, 54 Am.Bankr.L.J. 173, 187 (1979).

Section 547(c)(2) was not intended to include transactions in the nature of those before the court in this proceeding. The payments herein at issue were not made to the debtor's suppliers and were not in the nature of regular business expenses. The court concludes, therefore, that the transfers are not subject to the exception contemplated by § 547(c)(2).